SIXTH DIVISION

December 23, 2004

No. 1-02-3838

THE NORTHERN TRUST COMPANY and ANTOINETTE SCATES, ) Appeal from the 

as Co-Guardians of the Estate of MARSHAWN DAVIS, a Minor, ) Circuit Court of

) Cook County. 

Plaintiffs-Appellees, ) 

)

v. ) No. 98 L 05094

)       

THE UNIVERSITY OF CHICAGO HOSPITALS AND CLINICS, ) 

)

Defendant-Appellant ) 

)

(William Meadow, Chin-Chu Lin, R.J. Austin, Diane Ryan, Brian )

Rosner and Randall Barnes, ) The Honorable

) James P. Flannery, Jr.,

Defendants). ) Judge Presiding.

PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Plaintiffs-appellees the Northern Trust Company and Antoinette Scates, as co-guardians of the estate of Marshawn Davis, a minor (plaintiffs or as named), filed a two-count complaint at law: count I named defendant-appellant the University of Chicago Hospitals and Clinics (UCH) and defendants Drs. Chin-Chu Lin, R.J. Austin, Diane Ryan, Brian Rosner and Randall Barnes, alleging negligent care prior to the birth of Marshawn, causing mental retardation; and count II named UCH and defendant Dr. William Meadow, alleging negligent care of Marshawn in the neonatal unit after birth, causing a permanent injury to his left buttock.  With respect to count I, the jury returned a verdict for plaintiffs and against UCH only, awarding $10,912,500 in damages; with respect to count II, the jury returned a verdict for plaintiffs and against UCH and Dr. Meadow, awarding $758,400 in damages.  UCH appeals the verdict on count I only, contending that (1) the trial court erred in not granting judgment notwithstanding the verdict in favor of UCH due to plaintiffs' failure to provide sufficient evidence of proximate causation, and (2) the trial court erred when it refused to submit special interrogatories to the jury that would have tested the verdict.
(footnote: 1)  UCH asks that we reverse the judgment with respect to count I and vacate that award or, alternatively, that we remand for a new trial.  For the following reasons, we affirm.

BACKGROUND
(footnote: 2)
 In late October 1988, Scates was progressing through a high-risk pregnancy because of weight gain.  Her due date of October 22 had passed, and on October 26, 1988, she visited Dr. Ryan, a fourth-year resident, at a clinic for a nonstress test.  The test was nonreactive, indicating that there was no affirmative demonstration of fetal well-being, so Dr. Ryan sent Scates to UCH for further testing.  While at UCH, Dr. Rosner, a second-year resident, performed a second nonstress test and monitored the fetus.  This test indicated that the fetus was showing signs of well-being, so Dr. Rosner sent Scates home.

At about noon on October 31, 1988, Scates' waters broke.  She noted that the amniotic fluid had a brownish-mustard color; this is indicative of the presence of meconium (fetal waste) in the fluid.  At 3:20 p.m., Scates arrived at UCH and informed an obstetrical nurse in the triage area that her waters had broken.  Scates was admitted and placed in a labor room, and a fetal monitor was attach to her stomach at 3:50 p.m.  The monitor showed a normal fetal heart rate but also recorded several decelerations, during which the fetus' heart rate would decline for a brief time and return to normal.  Dr. Rosner performed a vaginal exam of Scates at 4:05 p.m., saw the meconium-stained fluid and determined that Scates was still some 12 to 20 hours away from a vaginal delivery.  By 4:22 p.m., Dr. Rosner noted a second prolonged deceleration in the fetal heart rate and concluded that the fetus was suffering from distress.  He consulted Dr. Lin, the attending obstetrician on duty, and Dr. Austin, who visited Scates between 4:25 and 4:28 p.m. and read the fetal heart tracings.  Dr. Lin recommended that Scates be turned to the side, be given oxygen and that an intrauterine pressure catheter be attached to help alleviate the decelerations.  Soon thereafter, Drs. Rosner and Lin, along with Dr. Ryan, discussed performing a cesarian section.  The catheter was attached at 4:38 p.m., and a note was entered in Scates' chart indicating that the operating room was currently occupied and that the doctors were awaiting the opening of a second room in which to perform the surgery.  Later, Dr. Ryan wrote a note in Scates' chart indicating that Scates gave consent for the cesarian section and that the doctors were waiting for the operating room.  At 4:53 p.m., Scates was disconnected from the monitors in her labor room for transport and reconnected between 4:59 and 5 p.m. in a different room; she was prepped for the cesarian section.  The first incision took place at 5:15 p.m. and Marshawn was delivered at 5:20 p.m. by the subsequent attending on duty, Dr. Barnes, with Drs. Rosner and Ryan assisting.  

At one minute after birth, Marshawn had an Apgar score of 1 on a scale of 1 to 10, indicting that he was blue, his heart rate was low, he had no reflex response and he was not breathing on his own; he also had moderate acidosis, indicating that he had acidic blood due to a change in the intrauterine environment.  He was suctioned and his Apgar score rose to 8 and then 9 at five minutes, as he had good color, heart rate and tone and was breathing on his own.  Marshawn was transferred to the regular newborn nursery, where he was active, alert, had good reflexes, ate and urinated well and exhibited no neurological abnormalities.  On November 1, 1988, approximately 12 hours after birth, Marshawn began experiencing cyanosis and right side seizure activity lasting several minutes.  He was medicated and transferred to the neonatal intensive care unit, where the seizures continued.  It was determined that Marshawn had suffered diminished blood, and thus oxygen, flow to the brain at some point in time surrounding his birth.  Marshawn, who was 13 years old at the time of trial, is moderately mentally retarded, functions as a 2 to 3 year old, and will need 24-hour supervision for the remainder of his life.
(footnote: 3)  

Plaintiffs filed a complaint at law against UCH and Drs. Lin, Austin, Ryan, Rosner and Barnes asserting negligent care prior to Marshawn's birth causing his mental retardation.
(footnote: 4)  Specifically, as against the doctors individually, plaintiffs alleged that they violated the standard of care by failing to promptly perform the cesarian section.  As against UCH, plaintiffs alleged that it was negligent in failing to have a second operating room available wherein to perform the cesarian section, and that it was negligent through the actions of its obstetrical triage nurse in failing to attach the fetal monitor in a timely manner, no later than 3:30 p.m. (rather than 3:50 p.m.).

Several doctors involved in the cause, as well as multiple medical experts, testified at trial regarding what occurred prior to Marshawn's birth and its possible effects.  Dr. Ryan testified that Scates arrived at UCH at 3:20 p.m. and was admitted at 3:50 p.m., whereupon a fetal monitor was attached.  After an examination by Dr. Rosner, Dr. Ryan noted the presence of meconium, a "worrisome sign" because it can indicate that the fetus has had a bowel movement in utero due to oxygen deprivation and because of the danger that the fetus will aspirate the meconium below his vocal cords and interrupt oxygen flow.  With respect to fetal heart rate and the placement of the monitor, Dr. Ryan noted that though presenting some variable decelerations, the fetal heart rate was normal until 4:18 p.m. when there was a sharp deceleration followed by another sometime before 4:30 p.m.  The intrauterine pressure catheter was placed at 4:38 p.m. to provide fluid to the fetus.  The heart rate returned within normal range and stayed that way until 4:50 p.m.  She testified that decelerations become a concern only when they are repetitive in 50% to 70% of the mother's contractions; the fetus here had only experienced decelerations in 2 of some 20 to 30 contractions.  The fetal heart rate actually improve around this time and exhibited no decelerations, indicating that the fetus was doing well even during Scates' contractions.  Dr. Ryan stated that the fetal tracings at this time showed that "there wasn't an extreme urgency to do the [cesarian] section."  

With respect to Marshawn's delivery, Dr. Ryan testified that UCH had four birthing rooms at the time: three set up to accommodate vaginal deliveries and one set up especially for cesarian section operations.  Any of the three vaginal delivery rooms may be converted into an operating room for the performance of a cesarian section, requiring that surgical instruments and other necessary medical equipment be brought into these rooms.  Dr. Ryan testified that there was never a situation where there was no place at UCH to accommodate a birthing emergency.  She further testified that she wrote a note in Scates' chart stating that Scates was not dilated, that a cesarian section was needed because Marshawn was experiencing fetal distress, that the operating room was currently occupied, that doctors were waiting for a second room to be opened in which a cesarian section on Scates could be performed, and that Scates had given her consent for the surgery.  Dr. Ryan could not decipher from the chart whether she wrote this note at 4:45 p.m. or 4:55 p.m., but testified that the decision to proceed with the cesarian section seemed to have been made sometime before 4:38 p.m., when the catheter was placed.  Dr. Ryan averred that the nurse's notes indicate that Scates gave her consent for the surgery at 4:50 p.m.  Scates was taken into a converted delivery room for the surgery by 5 p.m., the first incision took place at 5:15 p.m. and Marshawn was delivered at 5:20 p.m.  Dr. Ryan testified that she did not believe Marshawn suffered any fetal distress injury from the delay in his delivery because he was "pretty good at birth."  Dr. Ryan admitted, however, that Marshawn was depressed at birth, had no response or tone, was not breathing and had aspirated meconium below his vocal cords.  

Dr. Rosner testified that he was the first doctor to examine Scates at 4:05 p.m.  While noting the meconium in her amniotic fluid, Dr. Rosner did not believe this indicated that the fetus was in distress or that he was to be removed from the womb immediately.  With respect to the fetal heart rate and monitor, Dr. Rosner testified that a UCH obstetrical nurse assessed Scates upon Scates' arrival.  The fetal heart tracings, which did not begin until 3:50 p.m. after the fetal heart monitor was attached, showed the fetus was experiencing some stress but not severe distress or fetal distress.  He further stated that this was not a "life-threatening" situation and that there were intervals where the fetus was "doing just fine" and exhibiting reassuring signs.  This indicated that there was something compromising the fetus only intermittently.  Dr. Rosner stated that there was some concern between 4:22 p.m. and 4:25 p.m., when there was a prolonged deceleration whereupon he consulted with his senior, Dr. Lin.  

With respect to Marshawn's delivery, Dr. Rosner testified that he and Dr. Lin discussed the need for a cesarian section and decided to speak to Scates about the procedure between 4:27 p.m. and 4:28 p.m.
(footnote: 5)  Dr. Rosner averred that at 4:38 p.m., the catheter was placed and that a note was written in Scates' chart that the doctors were waiting for an operating room in which to perform the surgery.  After the placement of the catheter, the fetal heart rate did not exhibit any further decelerations.  Dr. Rosner believed that while a cesarian section was urgent, it was not emergent.  He explained that the delivery rooms and the operating room at UCH were interchangeable; it took approximately five minutes to convert a delivery room into a functioning operating room in which to perform a cesarian section.  Dr. Rosner was not sure when or how quickly UCH's staff was notified to prepare a room for Scates' surgery after the decision was made.  He averred that medical guidelines indicate the interval between the decision to perform a cesarian section and the first incision should not exceed 30 minutes.  Although Dr. Rosner believed Scates' "situation was a bit different" and that Marshawn ultimately had a "timely delivery," he admitted that the time interval exceeded 30 minutes and that a fetus experiencing distress usually should be removed as quickly as possible.

 Dr. Lin testified that based on the information presented to him around 4:22 p.m. regarding Scates, it was necessary to deliver the fetus as soon as possible but not immediately.  Although there were decelerations, after repositioning Scates and giving her oxygen and a fluid infusion through the catheter, the fetus' heart rate recovered and exhibited "very good reserve," or strength during contractions.  Dr. Lin concurred that all four rooms at UCH could be used for cesarian sections.  He believed that delivery at 5:20 p.m. was appropriate and acceptable, even though fetal distress was indicated throughout Scates' chart.  Dr. Lin further stated that Marshawn aspirated meconium below his vocal cords at some point during labor and delivery, resulting in asphyxia.  

Dr. Elizabeth Berry-Kravis, a pediatric neurologist, examined Marshawn and reviewed his neonatal medical records, as well as various MRI and CAT scans of his brain.  Dr. Kravis opined that Marshawn's brain damage resulted from a hypoxic ischemic event (a decrease of blood flow in some way to the brain) which hit his central nervous system during the "perinatal period," defined as several days before delivery, several days after delivery or during the actual delivery.  However, based on subsequent brain scans, Dr. Kravis believed the attributable event did not occur after Marshawn's birth or at the time of his seizures but, rather, either 24 to 48 hours before delivery or during delivery, with no time "more particularly likely" than another.  She further testified that the seizures Marshawn experienced could have occurred anytime between 8 and 72 hours after the event.  When asked what caused the decreased blood flow to Marshawn's brain, Dr. Kravis averred that there were "several hypotheses that one could raise, but we really don't know."

Dr. Steven Donn, a neonatologist, reviewed Marshawn's labor, delivery and birth records, his MRI and CAT scans, his follow-up records and various depositions in this cause.  He opined that "absolutely no way" did an event occur during the time between Scates' labor and the cesarian section sufficient enough to cause Marshawn's brain damage.  Rather, he averred that the event or events responsible antedated this period some two to four days.  He based his opinion on the fact that Marshawn exhibited completely normal signs of life at five minutes after birth.  Dr. Donn testified that had the hypoxic ischemic event occurred during the period between labor and delivery, Marshawn would have had marked difficulties with his cardiovascular and renal systems.  Dr. Donn also stated that asphyxia sufficient to cause the damage, had it occurred during this period, would have left Marshawn nearly comatose, hypotonic, with diminished activity and without reflexes.  Dr. Donn averred that any fetal distress Marshawn experienced in utero was alleviated by his delivery through cesarian section, which was sufficiently timely.  He further testified that the cause for Marshawn's seizures was "undetermined" and could have been the result of any number of different conditions he may have experienced, but that whatever their cause, it was not the cause leading to the need for a cesarian section (
i.e.
, fetal distress). 

Dr. William Roberts, an expert in maternal fetal medicine, testified on behalf of UCH.  He opined that everything done with respect to Scates' labor and delivery complied with the standard of care.  He stated that none of the four criteria for determining if an event during labor and delivery was sufficient to cause brain damage was present in this case: Marshawn's Apgar score at five minutes was excellent, he was not experiencing severe acidosis, he was not hypotonic at birth, and there was no evidence of other organ damage.  From this, Dr. Roberts concluded that whatever the event that caused Marshawn's brain damage, it did not occur during this time but, rather, at least 24 hours prior to when Scates arrived at the hospital.  With respect to the attachment of the fetal monitor, Dr. Roberts testified that with what Scates presented at the time she reached the hospital, she was "appropriately triaged" by the obstetrical nurse.  He explained that the 30-minute interval of time between her arrival at 3:20 p.m. and the attachment of the monitor at 3:50 p.m. was "very reasonable" in light of the obstetrical nurse's duties to take the mother-in-labor's vital signs, history, urine sample and place her in a labor room gowned and ready for examination by a doctor.  With respect to Marshawn's delivery, Dr. Roberts testified that the decision of when to perform the cesarian section was not determinative in this case.  He explained that because Scates was only urgent and not emergent, the general rule of performing a cesarian section within 30 minutes of a decision that one is necessary did not apply.  Dr. Roberts further opined that while the decision to perform the cesarian section could have been made earlier, the time at which it took place was still appropriate.

Dr. Richard Fields, a specialist in obstetrics and gynecology, testified as an expert witness for plaintiffs.  He reviewed Marshawn's medical records, prenatal care records, the fetal monitor strips from the delivery and various depositions pertinent to the cause.  In general respect to Marshawn, Dr. Fields testified that the named doctors had deviated from the standard of care in delaying the delivery.  He averred that as soon as the fetal monitor was attached to Scates there were "worrisome features," that between 4 p.m. and 4:25 p.m. this became an "obstetrical emergency," and that while there was some improvement in the fetal heart rate between 4:25 p.m. and 4:40 p.m., worrisome features continued.  He stated that the longer a fetus remains in distress in utero, the greater the resulting damage, and that the bulk of deprivation-of-oxygen injuries occur in the minutes right before delivery.  While Dr. Fields admitted that he could not definitively say that either the decelerations or the fetal distress Marshawn was experiencing was sufficient or severe enough to have caused his permanent brain damage, he opined that these factors clearly indicated that it was better to have had Marshawn out of the womb than remain inside for as long as he did.  Dr. Field stated that had Marshawn been delivered before 4:30 p.m., he would not have had any irreversible brain damage.

Specifically, with respect to the fetal heart monitor, Dr. Fields testified that it was the duty and responsibility of UCH's obstetrical nurse who admitted Scates to attach the monitor when Scates arrived at the hospital; because Scates arrived at 3:20 p.m., the monitor should have been attached no later than 3:30 p.m.  Dr. Fields opined that the nurse's attachment of the monitor at 3:50 p.m. was a deviation from the standard of care.  He stated that, to a reasonable degree of medical certainty, had the monitor been attached at the recommended time, it more likely than not would have shown earlier that Marshawn's fetal heart rate in utero was abnormal and would have led to the decision to perform the necessary cesarian section no later than 4 p.m., prompting Marshawn's delivery by no later than 4:30 p.m.  He further testified that even with the monitor attached at the time it was, doctors still had sufficient information to know that a completed cesarian section delivery was necessary by 4:30 p.m.

In addition, with respect to the delivery, Dr. Fields testified that it should take no longer than 10 minutes to prepare a room for cesarian section, bring in the patient and extract the fetus.  He opined that, to a reasonable degree of medical certainty, UCH deviated from the standard of care in not having such an operating room available and "ready to roll" for Scates' cesarian section.  Dr. Fields testified that the time delay in this regard caused a delay in Marshawn's delivery which, in turn, resulted in asphyxia and his brain damage.  

Dr. Steven Abern, a pediatric neurologist, also testified as an expert witness for plaintiffs.  Based on certain reports he reviewed, including Marshawn's labor and delivery records, MRI and CAT scans, and depositions, as well as an examination of Marshawn, Dr. Abern confirmed that Marshawn suffered from hypoxic ischemic encelphalopathy, a disorder of the brain due to a deprivation of blood flow and oxygen.  He opined that permanent damage occurred shortly before birth, within the last "[a]bout 30 to 45 minutes" of delivery, and that the longer Marshawn remained in utero, the more damage was occurring.  While he could not "rule in or rule out either way" whether the stress causing the passage of meconium before Scates arrived at the hospital caused the damage, he agreed with Dr. Fields that if Marshawn had been delivered earlier, there would have been less or no damage to his brain.

At the close of evidence, UCH, as well as the named doctors, moved for directed verdict.  The trial court denied these motions, except for that regarding Dr. Barnes.  The court granted this motion, stating that there was no evidence to refute the testimony presented that Dr. Barnes did not deviate from the standard of care to which he was held in this case (
i.e.
, timely reporting for the start of his hospital shift at 5 p.m.); thus, Dr. Barnes was effectively removed from the suit.  At this time, UCH and the remaining named doctors asked the trial court if it would allow certain special interrogatories to be submitted to the jury regarding the three allegations of the complaint: (1) that Drs. Lin, Austin, Ryan and Rosner failed to timely perform the cesarian section; (2) that UCH's obstetrical nurse failed to place a fetal monitor on Scates at 3:30 p.m.; and (3) that UCH failed to have a second operating room available in which to perform the cesarian section.  With respect to the named doctors, the special interrogatories (eight in number, two per doctor) read as follows:

"Did the defendant, [Dr. Lin, Austin, Ryan or Rosner], deviate from the standard of care in failing to timely perform a C-section to remove the fetus in light of fetal distress?"

and

"Was the failure of the defendant, [Dr. Lin, Austin, Ryan or Rosner], to timely perform a C-section to remove the fetus in light of fetal distress a proximate cause of the injury claimed and damage sustained by MARSHAWN DAVIS?"

The trial court allowed these special interrogatories.  UCH also proposed the following special interrogatories with respect to itself:

"Did the defendant, [UCH], deviate from the standard of care by failing to have a second OR room available to perform a C-section?";

"Did the obstetrical nurse deviate from the standard of care in failing to place the fetal  monitor on the patient [Scates] on or about 3:30 p.m.?"; 

and

"Do you find that Marshawn Davis' brain injury occurred within 45 minutes of the delivery at 5:20 p.m. on October 31, 1988?"

Plaintiffs objected to these three special interrogatories, contending that they were not in proper form because they were not dispositive of the issues at hand.  The trial court agreed and refused to submit these special interrogatories to the jury.  With respect to count I, the jury returned a verdict for defendant-doctors Lin, Austin, Ryan and Rosner and against plaintiffs, answering each of the special interrogatories with respect to the doctors in the negative.  However, the jury found for plaintiffs and against defendant UCH, awarding plaintiffs $10,912,500 in damages.
(footnote: 6)  The trial court entered judgment on the jury's verdict and denied UCH's posttrial motions for judgment notwithstanding the verdict, a new trial and substantial remittitur.  

ANALYSIS

UCH presents two issues for our review.  We address each separately.

I.  Judgment Notwithstanding the Verdict

UCH's first contention on appeal is that the trial court erred in not granting judgment notwithstanding the verdict in its favor.  UCH asserts that the jury's judgment for plaintiffs cannot stand because plaintiffs failed to present "anything beyond pure speculation" with respect to the cause of Marshawn's mental retardation.  UCH further asserts that the expert opinion testimony of Drs. Field and Abern was not accompanied by necessary reasoned analysis, reducing it to mere conclusions incapable of supporting the verdict in this cause.  We disagree.

The parties do not contest the appropriate standard of review.  A judgment notwithstanding the verdict is to be entered only when all the evidence, viewed in the light most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary verdict could stand based on the evidence.  See 
McClure v. Owens Corning Fiberglas Corp.
, 188 Ill. 2d 102, 132 (1999); see also 
Pedrick v. Peoria & Eastern R.R. Co.
, 37 Ill. 2d 494, 502 (1967) (instant parties citing above as the "
Pedrick
 standard").  In deciding whether to grant such a judgment, the trial court may not reweigh the evidence and set aside the verdict simply because a jury could have drawn different conclusions or inferences from the evidence or because it feels other possible results may have been far more reasonable.  See 
McClure
, 188 Ill. 2d at 132; 
Pedrick
, 37 Ill. App. 3d at 504 (the right of the parties to have a substantial factual dispute resolved by the jury should be "carefully preserve[d]" where such dispute exists); accord 
Maple v. Gustafson
, 151 Ill. 2d 445, 452 (1992).  Likewise, a reviewing court may not usurp the role of the jury and substitute its own judgment on factual questions fairly submitted, tried, and determined from evidence which did not overwhelmingly favor either position.  See 
McClure
, 188 Ill. 2d at 132 (reviewing court cannot substitute own judgment on questions of fact and witness credibility, which remain solely within the province of the jury); accord 
Jones v. Chicago Osteopathic Hospital
, 316 Ill. App. 3d 1121, 1125 (2000); 
Maple
, 151 Ill. 2d at 452-53.  Therefore, a 
de novo
 standard of review is applied to decisions on motions for judgment notwithstanding the verdict.  See 
McClure
, 188 Ill. 2d at 132.  

UCH's claim on appeal alleges that plaintiffs did not provide sufficient evidence, through medical testimony to a reasonable degree of medical certainty, with respect to the proximate causation element of their action.  See 
Seef v. Ingalls Memorial Hospital
, 311 Ill. App. 3d 7, 15 (1999) (the elements of a medical malpractice action plaintiffs are required to prove are the standard of care by which to measure UCH's conduct, that UCH negligently breached the standard of care, and that UCH's breach was the proximate cause of Marshawn's injury); accord 
Jones
, 316 Ill. App. 3d at 1126.
  We note, as UCH does, that the proof needed to sustain proximate causation in this case must come via medial expert testimony, or else plaintiffs' cause of action fails.  See 
Seef
, 311 Ill. App. 3d at 15; accord 
Mengelson v. Ingalls Health Ventures
, 323 Ill. App. 3d 69, 74-75 (2001) (in the absence of expert testimony presented by the plaintiff that the defendant's acts caused the injuries within a reasonable degree of medical certainty, a verdict in the plaintiff's favor cannot stand).  We further acknowledge that proximate causation is not established where the medical expert testimony of causal connection is " 'contingent, speculative or merely possible.' "  
Mengelson
, 323 Ill. App. 3d at 75, quoting 
Newell v. Corres
, 125 Ill. App. 3d 1087, 1092 (1984).  

However, plaintiffs will have sustained their burden in proving proximate cause as long as the medical expert testimony they presented demonstrates within a reasonable degree of medical certainty that UCH's breach in the standard of care is more probably than not the cause of Marshawn's mental retardation.  See 
Mengelson
, 323 Ill. App. 3d at 74-75; accord 
Borowski v. Von Solbrig
, 60 Ill. 2d 418, 424 (1975); see also 
Ziekert v. Cox
, 182 Ill. App. 3d 926, 930 (1989), citing 
Witherell v. Weimer
, 118 Ill. 2d 321, 337 (1987) ("[a]n expert opinion, held to a reasonable degree of medical certainty, provides an adequate basis for a jury finding that causation was proved").  Unquestionably, the relative weight, sufficiency and credibility assessed to medical expert testimony is "peculiarly within the province of the jury" (
Ziekert
, 182 Ill. App. 3d at 930), as is, ultimately, the resolution of evidentiary conflicts with respect to the factual question of proximate cause.  See 
Maple
, 151 Ill. 2d at 452; 
Mengelson
, 323 Ill. App. 3d at 75 ("[i]t is well established that issues involving proximate cause are fact specific and therefore uniquely for the jury's determination"); 
accord 
Borowski
, 60 Ill. 2d at 423 ("the question of whether the doctor['s] *** conduct was a proximate cause of the plaintiff's injury [is a] question[] of fact for the jury").

Obtaining judgment notwithstanding the verdict, then, essentially requires the trial court to outrightly reverse a jury verdict.  See 
Jones
, 316 Ill. App. 3d at 1125.  Based on the principles just announced, an undeniable conclusion becomes clear: the standard for obtaining a judgment notwithstanding the verdict is " 'a very difficult' " one to meet, limited to " 'extreme situations only.' "  
Jones
, 316 Ill. App. 3d at 1125, quoting 
People ex rel. Department of Transportation v. Smith
, 258 Ill. App. 3d 710, 714 (1994).  No court, trial or reviewing, has the right to enter such an award "if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome."  
Maple
, 151 Ill. 2d at 454.  This is exactly the situation in the instant case.

With respect to the first theory of negligence challenged by UCH, the time at which the fetal monitor was attached,
(footnote: 7) we disagree with UCH's contention that plaintiffs presented merely conclusory, and therefore "worthless," medical testimony that the delay in the monitor's placement by the obstetrical nurse was a proximate cause of Marshawn's injury.  To the contrary, there was appropriate and sufficient expert testimony in this regard to support the jury's verdict.  

In this voluminous record, testimony and evidence about the placement of the fetal monitor is remarkably scant.  The obstetrical nurse who placed the monitor was never named nor did she testify at trial.  The parties agree, and it remains undisputed, that Scates arrived at the hospital at 3:20 p.m. and the monitor was attached and began reading the fetal heart rate at 3:50 p.m.  There is some general testimony about what the monitor showed at this time from the doctors on duty, though it appears to be conflicting; Dr. Ryan testified that the monitor, once attached, showed a normal fetal heart rate, while Dr. Rosner testified that the monitor, once attached, showed signs of fetal distress.  There is also some general testimony alluding to the effect of the delay in attaching the monitor: UCH's expert Dr. Donn testified that there was "absolutely no way" that the injury occurred at or about the time of delivery but rather days before, so the time at which the monitor was placed was irrelevant to the injury; plaintiffs' expert Dr. Abern testified that had Marshawn been delivered earlier, there would have been little or no brain damage.  

Providing more specific testimony about the placement of the monitor was UCH's expert Dr. Roberts and plaintiffs' expert Dr. Fields.  Dr. Roberts testified that, based on the symptoms that Scates presented with when she arrived at the hospital, she was "appropriately triaged" by the obstetrical nurse.  He went on to explain that, in his opinion, the placement of the monitor at 3:50 p.m. was entirely reasonable, since the nurse would have needed time to take Scates to a labor room, obtain a urine sample and history, have her disrobe and prepare her for examination.  However, Dr. Fields' testimony was in direct contradiction.  It is true that Dr. Fields testified that even without earlier placement of the monitor, Marshawn should have been delivered earlier.  Yet, he also specifically testified that the placement of the monitor at 3:50 p.m.
 was a deviation from the standard of care.  In his opinion, which he explicitly stated was to a reasonable degree of medical certainty, it was the nurse's duty, based on what Scates was presenting with at the moment she arrived (
i.e.
, meconium-stained amniotic fluid), to attach the monitor no later than 3:30 p.m.  Dr. Fields further testified, again to a reasonable degree of medical certainty, that had the monitor been attached at 3:30 p.m., it more likely than not would have shown that Marshawn's heart rate was abnormal, prompting the decision to perform a cesarian section at 4 p.m. and obtaining Marshawn's delivery no later than 4:30 p.m. when, in his expert opinion, permanent brain damage had not yet occurred.  He based his opinions on his review of Marshawn's prenatal and medical records, the fetal monitor strips produced during delivery and the depositions of doctors and other experts in this cause.

Ultimately, what is presented here is a conflict between Dr. Roberts and Dr. Fields as to whether the placement of the monitor at 3:50 p.m. rather than 3:30 p.m. was a proximate cause of Marshawn's injury.  In simple terms, this boiled down to credibility--a battle of the experts.  The disagreement between these medical authorities as to cause-and-effect does not preclude a verdict for plaintiffs.  See 
Ziekert
, 182 Ill. App. 3d at 930.  Rather, as we noted above, an expert opinion, held to a reasonable degree of medical certainty--as Dr. Fields' was here--provides an adequate basis for a jury finding that causation was proved.  See 
Witherell
, 118 Ill. 2d at 337; 
Ziekert
, 182 Ill. App. 3d at 930.  The jury was free to believe Dr. Fields' testimony about the time-placement of the fetal monitor and its effect in this cause over that of UCH's witnesses.  It provides a solid basis for the jury's verdict against UCH.  

The same is true with respect to the other theory of negligence challenged by UCH: the availability of a second operating room.  Again, the evidence was reduced to a battle of experts.  Drs. Ryan and Rosner testified that UCH's delivery and operating rooms were interchangeable and that a delivery room could be converted to accommodate a cesarian section in minutes.  Both also acknowledged that a note was entered in Scates' chart indicating that doctors were awaiting the opening of an operating room.  Dr. Ryan testified that the decision to perform the surgery was reached before 4:38 p.m. when the catheter was placed, that the note was entered at 4:45 p.m. or 4:55 p.m., and that surgery began at 5:15 p.m.; Dr. Rosner testified that the decision was made even earlier.  However, Drs. Ryan, Rosner and Lin all testified that the 5:15 p.m. incision and 5:20 p.m. delivery of Marshawn were appropriate.  UCH's experts corroborated this, as Dr. Donn opined that delivery was timely and Dr. Roberts opined that any delay in setting up an operating room was not determinative in this cause, as the delivery time was appropriate.  In contradistinction, plaintiffs' experts testified that this was not the case.  Dr. Abern opined that had the cesarian section been performed earlier, before the last about 30 to 45 minutes before the actual birth, Marshawn would not have suffered irreversible brain damage.  More specifically, Dr. Fields opined, to a reasonable degree of medical certainty, that UCH's failure to have a second, unoccupied operating room "ready to roll" was inappropriate and violated the standard of care.  According to Dr. Fields (as well as every doctor who testified in this cause), the time between the moment a decision to perform the cesarian section is made and the first incision should be no more than 30 minutes.  Dr. Fields testified that here, those times (the pre-4:38 p.m. decision time and the 5:15 p.m. first incision) exceeded this standard and, in his expert opinion, caused a delay during which time Marshawn experienced asphyxia resulting in permanent brain damage.

Again, the expert testimony presented by plaintiffs in this regard was not, as UCH contends, conclusory.  Dr. Fields, in particular, provided testimony to a reasonable degree of medical certainty that UCH's unavailability of a second operating room was a proximate cause of Marshawn's injury.  Again, Dr. Fields' testimony was based on his review of Marshawn's medical records, his prenatal care records, medical standards and guidelines regarding cesarian sections and the fetal monitor strips.  This testimony, in conjunction with the named doctors' own testimony that the decision to perform a cesarian section was made outside the 30-minute interval specified in medical guidelines, provided a sufficient basis for the jury's verdict against UCH.  

UCH relies principally on 
Aguilera v. Mount Sinai Hospital Medical Center
, 293 Ill. App. 3d 967 (1997), and 
Kleiss v. Cassida
, 297 Ill. App. 3d 165 (1998), for its proposition that an "expert's naked opinion" with respect to proximate cause cannot sustain a jury's verdict.  While that proposition is indeed correct, UCH's reliance on these cases is misplaced.  

In 
Aguilera
, the plaintiff, the administrator of the estate of decedent patient, sued a hospital and physician based on medical malpractice, asserting that their delay in ordering and performing an earlier CT scan was a proximate cause of the decedent's death.  The plaintiff's medical experts testified that an earlier scan would have led to neurosurgery to prevent or lessen a second massive intracerebral hemorrhage.  However, these experts also admitted that they did not know whether this surgery should have been ordered even if a prompt CT scan had been performed; they testified that neurosurgery was a decision for neurosurgeons.  Yet, the only two neurosurgeons who testified in the cause agreed that even with an earlier CT scan, surgery would not have been appropriate or ordered because the decedent's bleed was too deep within his brain.  Based on this, the trial court granted judgment notwithstanding the verdict in favor of the defendants hospital and physician.  The reviewing court agreed, noting that without supporting testimony from a neurosurgeon, the plaintiff's expert testimony was "insufficient to show that neurosurgery, much less effective neurosurgery, should have occurred absent [the] defendants' negligence," and created "a gap in the evidence of proximate cause fatal to" the plaintiff's case.  
Aguilera
, 293 Ill. App. 3d at 975.  In 
Kleiss
, the plaintiffs alleged that their crops were damaged by the defendant's spraying of herbicide on nearby farms.  The plaintiffs' expert testified that the herbicide could have traveled through the air and onto the plaintiffs' property.  However, the expert could provide no reason whatsoever for this opinion other than his 20 to 30 years' experience in this field.  The trial court granted judgment notwithstanding the verdict for the defendant and the reviewing court affirmed, finding that the expert had provided only unsupported, conclusory opinions.  See 
Kleiss
, 297 Ill. App. 3d at 174.

In both 
Aguilera
 and 
Kleiss
, the complete lack of expert testimony proximately connecting the action complained of (delayed CT scan, herbicide spraying) to the result complained of (death, crop death) created a missing link in the plaintiffs' cases.  This insufficient evidence signaled the failure of these plaintiffs to establish all the necessary elements of their cases, leaving only conjecture that a named action may have caused an end result.  Accordingly, the jury verdicts could not stand as they had no solid basis in the evidence presented, and judgments notwithstanding the verdict were proper.  This is true as well of the parenthetical cases upon which UCH relies in its brief on appeal, wherein the reversal of jury verdicts were all based on the complete lack of required expert testimony.  See 
Snelson v. Kamm
, 319 Ill. App. 3d 116, 130-31 (2001), 
aff'd in part, rev'd in part on other grounds, & remanded,
 204 Ill. 2d 1, 49 (2003) (affirming trial court's grant of judgment notwithstanding jury's verdict for the plaintiff and against hospital where expert testimony was considered vague and conclusory because no medical expert testified about proximate causation to link nursing staff's alleged misconduct to injury); 
Townsend v. University of Chicago Hospitals
, 318 Ill. App. 3d 406, 414 (2000) (reversing jury verdict for the plaintiff where record did not disclose any potential treatment for the patient's condition, and thus, there was no testimony regarding proximate causation); 
Susnis v. Radfar
, 317 Ill. App. 3d 817, 827 (2000) (where "no expert evidence was adduced to a reasonable degree of medical certainty" that doctor's alleged deviations caused the patient's injury, directed verdict for doctor was proper).

The reasoning in this line of cases, however, does not apply here.  As we have thoroughly discussed, the instant case is not one where there was a complete lack of expert medical testimony as to proximate cause.  To the contrary, the record is clear that plaintiffs presented such evidence, particularly through the testimony of Dr. Fields, with respect to both theories of negligence they asserted against UCH.  We find the instant case more akin to 
Jones v. Chicago Osteopathic Hospital
, 316 Ill. App. 3d 1121 (2000).  In 
Jones
, a woman presenting a high-risk pregnancy due to her being overweight and past her due date was admitted to defendant hospital and induced by a doctor into labor using the drug Pitocin.  After several hours, she began experiencing strong contractions, but her cervix was not dilating and the fetus was not descending into the birth canal.  Hours later, her cervix had dilated two centimeters, enough for the doctor to attach an internal probe to monitor the fetal heart rate; the monitor showed that the woman was experiencing severe contractions.  The doctor testified that almost three hours later, the woman's cervix had dilated one to two more centimeters, and that standard practice suggested delivery by cesarian section if a woman in active labor does not completely dilate after two hours of strong contractions.  However, the doctor did not consult with a senior resident or physician, did not elect to proceed with a cesarian section, and instead left the room and did not return for another 45 minutes.  When the doctor did return, he examined the woman, found her to be fully dilated, and instructed her to push; the fetus retracted into the womb and exhibited a decreased heart rate and oxygen flow.  The doctor tried intrauterine resuscitation measures, but to no avail.  He then called upon a senior doctor, who ordered a cesarian section.  After 30 hours of labor, the baby was delivered, born with severe brain damage due to hypoxic ischemic encephalopathy (oxygen deprivation).  It was later determined that the woman's uterus had ruptured in two places and there had been a complete placental abruption, ceasing all blood or oxygen exchange between mother and fetus.  

The woman brought suit against defendant hospital and its doctors and nurses, alleging negligence in the handling of the delivery.  Defense experts testified that the hospital, doctors and nurses acted reasonably under the circumstances and did not breach the standard of care; that the woman's doctor reacted appropriately to the crisis; and that the cesarian section was performed within a reasonable time.  Plaintiffs' expert, however, testified that the hospital and staff had committed several breaches in the standard of care.  He stated that a patient receiving Pitocin must be closely observed because of the high risk associated between the drug and uterine rupture.  He further stated that the doctor and nurses failed to personally monitor the woman for a period of 45 to 60 minutes, during which time they failed to observe that the fetal heart monitor was showing signs of decelerations indicating reduced oxygen intake and, consequently, failed to recognize that a cesarian section should have been ordered earlier, which would have avoided the prolonged period of hypoxia and lessened or prevented entirely the baby's brain injury.  

Based upon this evidence, the jury returned a verdict for the plaintiffs and the trial court denied the defendant hospital's motion for judgment notwithstanding the verdict.  On appeal, the defendant hospital cited, as UCH does here, a line of cases in which the expert testimony presented failed to show a causal connection between the alleged breach and the injury.  The reviewing court, however, found that this did not apply.  See 
Jones
, 316 Ill. App. 3d at 1131.  Rather, after examining the plaintiffs' expert's testimony in conjunction with the other evidence presented, it believed that there was a solid basis for the jury's verdict against the hospital.  See 
Jones
, 316 Ill. App. 3d at 1131.  The 
Jones
 court recognized that, despite the defendant hospital's disparaging remarks about that expert's credentials, he nevertheless was qualified as an expert witness, provided opinions held to a reasonable degree of medical certainty, and clearly testified as to a causal connection between the defendant hospital's negligence in failing to observe the patient and timely order a cesarian section and the baby's resulting brain damage.  See 
Jones
, 316 Ill. App. 3d at 1131.  Therefore, the reviewing court affirmed the trial court's denial of the defendant hospital's motion for judgment notwithstanding the verdict.  See 
Jones
, 316 Ill. App. 3d at 1131.

The instant cause merits the same conclusion.  After reviewing the record, we cannot say that the evidence, when viewed in the light most favorable to plaintiffs here, so overwhelmingly supports UCH that judgment notwithstanding the verdict was warranted.  The trial court was presented with substantial factual disputes with respect to the effect of the time-placement of the fetal monitor and the delay in availability of a second operating room; resolution of these disputes required an assessment of the credibility of expert witnesses' conflicting testimony, the determination of which was decisive to the outcome of this cause.  It is precisely under these circumstances that judgment notwithstanding the verdict is not to be granted.  While we may not agree with the jury's decision in this cause, we, with conviction, do not believe that UCH has met the difficult standard at issue here.  

Accordingly, we find no error in the trial court's denial of UCH's motion for judgment notwithstanding the verdict.  

II.  Special Interrogatories

UCH's second, and final, contention on appeal is that the trial court committed reversible error when it refused to submit certain special interrogatories to the jury that would have tested the verdict against it.  UCH argues that three interrogatories it submitted with respect to itself tracked the language of the assertions in plaintiffs' tendered issues instructions.  UCH insists that the interrogatories were proper in form and, thus, their submission was mandatory.  We disagree.

As noted earlier, the three special interrogatories UCH proposed that are now at issue are:

"Did the defendant, [UCH], deviate from the standard of care by failing to have a second OR room available to perform a C-section?";

"Did the obstetrical nurse deviate from the standard of care in failing to place the fetal monitor on the patient [Scates] on or about 3:30 p.m.?"; 

and

"Do you find that Marshawn Davis' brain injury occurred within 45 minutes of the delivery at 5:20 p.m. on October 31, 1988?"
(footnote: 8)
Plaintiffs objected to these proposed special interrogatories before the trial court, stating that they were improper in form because each, separately, whether answered either affirmatively or negatively by the jury, would not be dispositive of the issues.  The court then proceeded to examine each of the interrogatories.  With respect to the first, about the availability of a second operating room, the court asked UCH what the result would be if the jury answered that interrogatory in the negative; UCH responded that in that case, the interrogatory would not be inconsistent with the general verdict and the verdict would stand.  The court then asked UCH what the result would be if the jury answered that special interrogatory in the affirmative; UCH again responded that the interrogatory would not be inconsistent with the general verdict and the verdict would, again, stand.  At this point, the court asked UCH what the purpose of the interrogatory was, how it could be inconsistent with the general verdict, and thus, how it was controlling of the issues.  UCH admitted that as a single question, it was "not necessarily, depending on how it is answered, inconsistent with the general verdict," and urged that it needed to be "taken as a whole" with the other proposed special interrogatories.  Upon plaintiffs' objection that a special interrogatory must, standing alone, be dispositive of an issue in order to be proper in form and cannot be linked to other interrogatories, the trial court agreed and refused to submit the second operating-room-availability special interrogatory to the jury.

As the discussion between the parties and the court moved to the next proposed special interrogatory regarding the time-placement of the fetal heart monitor, UCH renewed its same argument for its submission and plaintiffs renewed their same objection.  The court sustained the objection and refused to submit it to the jury, noting that it believed that this special interrogatory, too, was "not dispositive of the issues."

Finally, with respect to the third proposed special interrogatory, about whether Marshawn's injury occurred within 45 minutes of his delivery, plaintiffs again objected, arguing that it was not dispositive of the issues and that it was improper in form because testimony had been given that other events occurring before this 45-minute mark may have combined with what happened at that time to cause the injury.  UCH rebutted by stating that plaintiffs' theory of the case rested solely on Dr. Abern's testimony that injury occurred in the last 30 to 45 minutes before Marshawn's birth and, thus, the special interrogatory "would indeed be controlling."  The court recognized that "a couple of witnesses" had testified that the cause of Marshawn's brain damage was something that may have occurred hours or days before the delivery and that it may have been the result of a combination of causes occurring throughout this time.  Upon that finding, the court sustained plaintiffs' objection to this special interrogatory and refused to submit it to the jury.

The parties recognize that special interrogatories are governed by section 2-1108 of the Illinois Code of Civil Procedure (Code), which states in pertinent part:

"The jury may be required by the court, and must be required on request of any party, to find specially upon any material question or questions of fact submitted to the jury in writing.  Special interrogatories shall be tendered, objected to, ruled upon and submitted to the jury as in the case of instructions.  Submitting or refusing to submit a question of fact to the jury may be reviewed on appeal, as a ruling on a question of law."  735 ILCS 5/2-1108 (West 2002).

Special interrogatories have been termed " 'guardian[s] of the integrity of a general verdict' " in civil jury trials.  
Simmons v. Garces
, 198 Ill. 2d 541, 555 (2002), quoting 
O'Connell v. City of Chicago
, 285 Ill. App. 3d 459, 460 (1996).  Their purpose is to test a general verdict against the jury's determination as to one or more specific issues of ultimate fact.  See 
Simmons
, 198 Ill. 2d at 555; accord 
Snyder v. Curran Township
, 281 Ill. App. 3d 56, 63 (1996) (purpose is to "sharpen the jury's consideration of the questions presented by the case, to ascertain the jury's finding on an ultimate issue of material fact, and to serve as a check upon the jury's deliberations by testing the jury's general verdict against its determination on the material fact at issue").  

As stated in section 2-1108 of the Code, upon the request of a party, a trial court has no discretion but to submit to the jury a special interrogatory, as long as it is in proper form.  See 735 ILCS 5/2-1108 (West 2002); 
Stach v. Sears, Roebuck & Co.
, 102 Ill. App. 3d 397, 411 (1981) (only when special interrogatory is objectionable may trial court use its discretion).  A special interrogatory is in proper form if (1) it relates to an ultimate issue of fact upon which the rights of the parties depend, and (2) an answer responsive thereto is inconsistent with some general verdict that might be returned.  See 
Simmons
, 198 Ill. 2d at 555.  The required inconsistency arises when the special interrogatory is " 'clearly and absolutely irreconcilable with the general verdict.' " 
Simmons
, 198 Ill. 2d at 555-56, quoting 
Powell v. State Farm Fire & Casualty Co.
, 243 Ill. App. 3d 577, 581 (1993).  If a special interrogatory does not cover the issues upon which the jury is called to render a decision and a " 'reasonable hypothesis' " is left unaddressed that would allow the special interrogatory to be construed consistently with the general verdict, the special interrogatory is not "absolutely irreconcilable" with the general verdict, is improper in form, and, thus, may not be submitted to the jury.  See 
Simmons
, 198 Ill. 2d at 556, citing 
Powell
, 243 Ill. App. 3d at 581.  

Beginning with the first two special interrogatories at issue here, namely, those asking whether there was a deviation from the standard of care in UCH's failure to have a second operating room available and in failing to place the fetal monitor on or about 3:30 p.m., we note that a special interrogatory asking for a finding as to a mere evidentiary fact is always improper.  See 
Gasbarra v. St. James Hospital
, 85 Ill. App. 3d 32, 38 (1979).  In addition, our courts have made clear that a proper special interrogatory consists of a single, direct question that, standing on its own, is dispositive of an issue in the case such that it would, independently, control the verdict with respect thereto.  See 
Snyder
, 281 Ill. App. 3d at 59, 61, citing 
Illinois Steel Co. v. Mann
, 197 Ill. 186, 189 (1902); accord 
Hollis v. Terminal R.R. Ass'n of St. Louis
, 72 Ill. App. 2d 13, 21 (1966).  

Upon application of these principles to our review of these two special interrogatories, we find that the trial court properly refused to submit them to the jury, as they were improper in form since an answer to either could easily be reconciled with the general verdict.  In other words, neither of these special interrogatories, standing on its own, was "inconsistent" with the general verdict or dispositive of the issue of UCH's negligence/proximate causation.  The answer to either one would not determine the jury's finding as to the ultimate fact of whether UCH had been negligent in its actions prior to Marshawn's birth, thereby causing his brain damage.  This is because plaintiffs alleged negligence against UCH on two alternate theories, not simply one.  If one of these special interrogatories were answered in the negative, the general verdict would remain untested since the other theory of negligence would still be alive to support the verdict, thereby leaving a "reasonable hypothesis" unaddressed that would allow the special interrogatory to be construed consistently with the general verdict.
  

For example, whether the jury answered the operating room special interrogatory affirmatively or negatively, it would have had no effect on the general verdict, as the second theory of negligence, 
i.e.
, UCH's nurse's failure to timely place the fetal monitor allegedly causing Marshawn's injury, could equally support a general verdict finding UCH liable.  The same is true if the jury would have answered the fetal monitor special interrogatory affirmatively or negatively; the alternative theory of the failure to have a second operating room available would remain alive to support the jury's general verdict.  Accordingly, these interrogatories were not in proper form and, contrary to UCH's claim, the trial court appropriately refused to submit them to the jury.  See, 
e.g.
, 
Simmons
, 198 Ill. 2d at 555-56; see also 
Stach
, 102 Ill. App. 3d at 411 (where there were two alternate theories of negligence asserted against the defendant, and the special interrogatory at issue addressed only one, reviewing court held that special interrogatory was not in proper form as answer to it "would not necessarily be inconsistent with the general verdict"); 
Gasbarra
, 85 Ill. App. 3d at 38-39 (holding that special interrogatory should not have been given because, whether answered affirmatively or negatively, it would not have been inconsistent with any general verdict since the plaintiff's action was based on both the alleged malpractice of the defendant's agent and the separate liability of the defendant because of other alleged failures).

During its discussion with the court about the propriety of these two special interrogatories, UCH admitted that neither would test a general verdict.  Yet, UCH argued, and does so again here, that these interrogatories would indeed test a verdict when "taken as a whole"; UCH urges that these separate interrogatories are to be linked together, and, considering them as such, they would be in proper form.  
However, we have already noted that our courts have declared that a special interrogatory, in order to be in proper form, must, standing on its own, be dispositive of an issue and independently control the verdict
 
with respect thereto.  See 
Snyder
, 281 Ill. App. 3d at 59, 61, citing 
Illinois Steel Co.
, 197 Ill. at 189; 
Hollis
, 72 Ill. App. 2d at 21.  This indicates that the piggy-backing of special interrogatories is not permitted.  See
 
Hollis
, 72 Ill. App. 2d at 21 (where ultimate fact of the defendant's liability could only be determined by a finding on both of two separate special interrogatories, reviewing court held that these interrogatories were not in proper form: "[s]ince neither interrogatory[,] standing on its own, could control the verdict, the trial court properly refused the special interrogatories").  Moreover, while UCH is correct that a special interrogatory may focus on only one element of a claim and still be in proper form (see 
Simmons
, 198 Ill. 2d at 563; 
Snyder
, 281 Ill. App. 3d at 60), this is true only if that element is dispositive of the claim at issue (see 
Snyder
, 281 Ill. App. 3d at 60).  In the instant case, the two special interrogatories do not deal with any of the elements of negligence (negligence, proximate cause or injury) but only alternative theories of negligence; regardless, as we have already discussed, they were not independently dispositive of the claim at issue. 

UCH's reliance on 
Eaves v. Hyster Co.
, 244 Ill. App. 3d 260 (1993), for its argument that linking special interrogatories is permissible is misplaced, as that case is entirely distinguishable from the instant one.  In 
Eaves
, a worker injured while replacing a chain on an industrial work truck brought suit against the manufacturer of the truck, alleging that it was negligent in failing to (1) offer a replacement chain retaining device; (2) give adequate directions as to how to repair a slipped chain; (3) issue directions on how to block the sections of the truck that fell and injured him; (4) prepare adequate directions with respect to removal of the adapter plate; and (5) place legible warnings on the truck.  The manufacturer tendered three special interrogatories: Was the failure of the worker's employer to maintain the truck in a safe condition and to train the worker in properly performing truck repairs the sole proximate cause of his injury?; Was the worker's undertaking to repair the truck when he knew he was not qualified the sole proximate cause of his injury?; and, Do you find that an absence of warning signs in the manufacturer's service manuals or on the truck was a proximate cause of his injuries?  The trial court found these interrogatories to be proper and submitted them to the jury.  The jury returned a verdict for the manufacturer.  Upon the worker's challenge on appeal to the submission of the interrogatories, the reviewing court agreed with the trial court that they were proper.  See 
Eaves
, 244 Ill. App. 3d at 266-67.  The 
Eaves
 court noted that each special interrogatory directed the jury's attention to all potential culpable entities: the employer, the worker and the manufacturer.  See 
Eaves
, 244 Ill. App. 3d at 267.  Thus, in 
Eaves
, any of these three interrogatories would, standing on its own, have been dispositive of the issue of liability.  The "series" of three, as UCH labels them, were not interdependent but, rather, independent as they posed questions on separate liability issues that would have potentially controlled the verdict.  In contrast, the two special interrogatories at issue here were interdependent, as both dealt with alternative theories with respect to the same issue of liability against the same potential culpable entity and both had to be answered in like manner in order to have any effect on the general verdict.  

Finally, turning to the third special interrogatory at issue here, we again find that the trial court's refusal to submit it to the jury was proper.  This interrogatory asked the jury whether it believed that Marshawn's brain injury occurred within the last 45 minutes of his delivery.  UCH argues that it was at least entitled to this interrogatory because it "would have forced the jury to focus" on plaintiffs' "weak causation theory" which, UCH claims, was that Marshawn's permanent brain damage necessarily occurred in the final 30 to 45 minutes before his birth.  According to UCH, a negative answer to this interrogatory would have been inconsistent with the jury's general verdict against it and, citing 
Simmons
 and 
Costa v. Dresser Industries, Inc.
, 268 Ill. App. 3d 1 (1994), concludes that the interrogatory was in proper form.  

However, upon examination, this third special interrogatory inquires only as to a mere evidentiary fact, not as to an ultimate fact upon which the rights of the parties here depend.  That is, the interrogatory is not determinative of a controlling issue in the cause and, thus, is not proper in form.  This is so for multiple reasons.  First, the time frame used by UCH to formulate this interrogatory--"within 45 minutes of the delivery" at 5:20 p.m.--was not in accord with the evidence presented.  Contrary to UCH's contention, plaintiffs' theory of when the negligence occurred was not based on a strict 30- to 45-minute time period.  Rather, Dr. Fields testified that delivery of Marshawn before 4:30 p.m. would have prevented any irreversible brain damage; this leaves a 50-minute time period during which the jury could have determined that UCH's actions caused the injury, not a 45-minute one.  Likewise, Dr. Abern testified that brain damage occurred within the last "
[a]bout 
30 to 45 minutes" (emphasis added) of Marshawn's delivery, again leaving open a time period greater than the strict 45-minute one specified by UCH in the special interrogatory.  Thus, because the interrogatory does not cover the entire time to which the experts testified, it cannot be dispositive in this cause.

Moreover, as the trial court noted, several experts testified that Marshawn's injury could have been the result of a combination of factors arising days or hours before his delivery and the period right before his delivery, and not simply "within 45 minutes of the delivery."  These included Dr. Kravis, who stated that there was no time more particularly likely than another for the injury to have occurred and that several hypotheses could be proposed but "we really don't know" the cause; Dr. Roberts, who testified that the injury occurred hours before delivery; and Dr. Donn, who testified that the injury could have occurred days before Scates even arrived at the hospital and could have formed due to any number of different conditions Marshawn experienced throughout his time spent in utero.

Obviously, then, either an affirmative or negative answer as to whether the injury occurred within 45 minutes of the delivery is not dispositive here. 
 Again, plaintiffs alleged negligence against UCH for its failure to place the fetal monitor at or about 3:30 p.m. and for its failure to have a second operating room available at the time it was decided to perform a cesarian section, which Drs. Ryan and Rosner testified was sometime before 4:38 p.m. when the catheter was placed.  Both of these times at ultimate issue in this cause--3:30 p.m. and sometime before 4:38 p.m.--precede the 45 minutes before Marshawn's 5:20 p.m. delivery which is the subject of the interrogatory.  As UCH was the party that proffered this interrogatory, it had the duty to fashion it in a precise manner and is responsible for any ambiguity, gap in the evidence or issues it does not cover.  See 
Bilderback v. Admiral Co.
, 227 Ill. App. 3d 268, 271 (1992).

UCH's reliance on 
Simmons
 and 
Costa
 does not support its argument here, as both cases are inapposite.  In 
Simmons
, the defendant-physician's special interrogatory asking whether dehydration caused the decedent's death was held to be in proper form and was submitted to the jury.  However, the plaintiffs had based their entire case on the theory that the defendant's negligence caused the decedent's death by allowing her to become dehydrated, and no other expert testimony was presented establishing the defendant's negligence had the decedent died from another cause.  Therefore, an answer to the special interrogatory would have left no other reasonable hypothesis on which to reconcile the jury's special finding with the general verdict.  See 
Simmons
, 198 Ill. 2d at 557.  Similarly, in 
Costa
, a special interrogatory asking the jury if it believed that the decedent died from the disease mesothelioma was held to be in proper form and appropriately submitted to the jury.  Again, the plaintiff's entire case was premised on her claim that the decedent had died of the disease, making that issue a question of ultimate fact; a jury's answer to it would have been dispositive of the plaintiff's claim.  See 
Costa
, 268 Ill. App. 3d at 11.  As we have consistently pointed out, plaintiffs here, in contrast to those in 
Simmons
 and 
Costa
, did not couch their entire case on what occurred within the final 45 minutes before Marshawn's birth.  Neither an affirmative nor negative answer to the special interrogatory at issue would have been dispositive of their claims, as other reasonable hypotheses, brought out by the testimony and allegations of this cause, were left unaddressed by this interrogatory.  See 
Blue v. Environmental Engineering, Inc.
, 345 Ill. App. 3d 455, 468-69 (2003) (special interrogatory about whether danger was open and obvious did not decide rights of parties and thus was not proper, as action was based on negligence and open and obvious danger is only one of many considerations in such a claim); 
Ellerman v. Clark Products, Inc.
, 67 Ill. App. 3d 848, 855-56 (1978) (where ultimate issue was whether the plaintiff-broker had originated one of defendants as a purchaser of defendant-corporation for which he was to receive commission, special interrogatory asking if purchaser learned that corporation was for sale would not have resolved that issue; answer to it would have been a finding on a mere evidentiary fact and, thus, special interrogatory was properly refused by trial court).  

Accordingly, we find that each of UCH's three proffered special interrogatories was improper in form in its own right and, therefore, the trial court properly refused to submit them to the jury.  

 CONCLUSION

In sum, for all the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

McNULTY and TULLY, JJ., concur.

FOOTNOTES
1:
Drs. Lin, Austin, Ryan, Rosner, and Barnes are not parties to the instant appeal; similarly, Dr. Meadow chose not to appeal the verdict with respect to count II and, thus, is not a party to the instant appeal.
  

2:
As the instant appeal involves only count I and only those allegations against UCH, our recitation of the facts will be limited accordingly.  That is, because the only allegations on appeal deal with the availability of an operating room at UCH and the time of placement of the fetal heart monitor by UCH's obstetrical nurse, we present those facts relevant to these allegations only.  

3:
The evidence is uncontested that Marshawn's brain damage is in no way attributable to any genetic or metabolic condition. 

4:
Count two of plaintiffs' complaint focused on events in the neonatal intensive care unit of UCH concerning after-birth treatment provided by Dr. Meadow; an umbilical artery catheter slipped down into Marshawn's iliac and gluteal arteries.  The misplacement and retention of this catheter blocked blood flow to Marshawn's left buttock, resulting in necrosis and permanent severe tissue loss.  On this count, the jury found that UCH and Dr. Meadow did not conform to the standard of care in using and retaining the catheter and, thus, were negligent and liable to plaintiffs in the amount of $758,400.  Neither Dr. Meadow nor UCH appeals that verdict.
  
Accordingly, we will not discuss that portion of the cause further.

5:
No written order for the cesarian section was ever entered in Scates' chart.  Apparently, this is common practice at UCH.  We note this solely to clarify that the exact time at which it was decided a cesarian section was necessary, as well as which treating doctor made the ultimate decision, are not disclosed in the record.

6:
The award was itemized as follows: $3,500,000 for disability; $212,500 for pain and suffering; $1 million for loss of earnings; $6,200,000 for caretaking expenses and therapies.

7:
A special interrogatory submitted to the jury would have elicited on which of the two (or perhaps both) legal theories of negligence it relied for its verdict against UCH: the failure to attach the fetal monitor at 3:30 p.m. and/or the failure to have a second available operating room.  See 
Goad v. Evans
, 191 Ill. App. 3d 283, 293 (1989).  However, such an interrogatory was not submitted here, the ramifications of which will be discussed in further detail below.  Accordingly, we review each of the legal theories independently, ultimately finding that UCH fails to meet the standard of relief it seeks under both.

8:
At trial, these were denoted as special interrogatories 4, 5 and 7, respectively.