SECOND DIVISION

MAY 22, 2001

No. 1-00-3353

CAROLYN MENGELSON, ) Appeal from the

) Circuit Court of

Plaintiff-Appellant, ) Cook County

)

v. ) 95 L 2989

)

INGALLS HEALTH VENTURES, ) The Honorable

) Michael J. Kelly,

Defendant-Appellee. ) Judge Presiding.

JUSTICE COUSINS delivered the opinion of the court:

Plaintiff-appellant, Carolyn Mengelson, filed suit against defendant-appellee, Ingalls Health Ventures, alleging that defendant was negligent for failure to hire a competent and skilled phlebotomist for drawing blood and that as a direct and proximate result of the negligent acts, the plaintiff suffered injuries.  At the close of plaintiff's case in chief, Ingalls Health Ventures moved for a directed verdict.  The motion for directed verdict was granted.  Plaintiff appeals from the order granting the motion for directed verdict.  The major issue upon appeal is whether the trial court erred in granting defendant's motion for directed verdict.  

We affirm.

BACKGROUND

On February 23, 1993, plaintiff visited Ingalls Family Health Center (Ingalls) in Calumet City, Illinois, for an annual physical examination required by her employer.  That physical included a routine blood draw.  

Plaintiff testified at trial that during the physical examination, Theresa Chavez, a medical assistant for Ingalls, came into the room in which plaintiff was lying down to draw her blood.  Chavez placed a tourniquet on plaintiff's left arm and supported plaintiff's elbow with her hand.  Plaintiff testified that Chavez looked for a vein in her left arm but did not palpate for a vein before she inserted the needle.  Chavez asked plaintiff whether it had always been difficult to find a vein on her arm.  Plaintiff answered in the negative and asked Chavez to use her right arm.

Despite plaintiff's request, Chavez inserted the needle into plaintiff's left arm, but was unsuccessful in drawing blood on the first attempt.  Plaintiff again asked Chavez to use her right arm for the blood draw.  Plaintiff testified that Chavez then "backed the needle out and then injected it deeper into my skin and started poking and fanning around with the needle under my skin in a fanning-out type motion."  Chavez still did not obtain blood from plaintiff.  Plaintiff asked Chavez to switch to the right arm for the third time.  Plaintiff stated that by Chavez's third attempt to draw blood from the left arm, she began to feel "nauseated because of the procedure."  Plaintiff testified that as blood finally began to trickle into the vial, she felt a "sharp, stabbing pain" in her inner arm.  Plaintiff stated that she told Chavez that she was in "excruciating" pain and asked her to stop, but Chavez said "'No, I think I'm getting it now.'" Chavez then removed the vial attached to the needle and attached a second vial.  Plaintiff, again, asked her to stop but Chavez told her, "'If you can just hold still, it will only be a few more seconds.'"

When Chavez finally withdrew the needle, plaintiff still felt "excruciating" pain in her left arm.  Plaintiff remained at Ingalls for about 45 to 60 minutes after the blood draw and was seen by a doctor.  She told the doctor about her pain and the doctor told her that her arm was in a "spasm" but the medical assistant could not have gone deep enough to hit a nerve.  

Plaintiff stated that she was nauseous the day following the blood draw and left work early due to the pain.  Plaintiff called Ingalls at 6 p.m. on the evening of February 24, 1993, and notified it of her discomfort.  She was advised to seek emergency treatment at an emergency clinic near her home.  The emergency clinic gave the plaintiff pain medication and advised her to go to a hospital.  Plaintiff's husband drove her to Edwards Hospital.  The hospital gave plaintiff some additional pain medication and, because her injury was not considered an emergency, she made an appointment with a neurologist for the following morning.  

Plaintiff testified that for weeks after the blood draw at Ingalls, she felt a "burning sensation under the skin like there's just like fire breathing under the skin" of her left arm.  Plaintiff also complained of sleeplessness.  At one point, plaintiff wore a sling on her left arm.  

On May 19, 1993, plaintiff was in an automobile accident.  After the collision, she felt a burning in the middle of her neck.  Plaintiff stated that she experienced "continued burning, aching, the same sort of sensations" in her left arm as previously.  Plaintiff participated in occupational therapy for her left hand and arms and physical therapy for her neck and shoulders.

By November 1993, plaintiff's arm began "changing colors" and became more painful.  Nerve blocking treatments offered some temporary relief.  Eventually, plaintiff was transferred from her employment position because it required travel and carrying items in excess of her doctor's recommendation.

Dr. Timothy Lubenow testified by way of evidence deposition.  He stated that he saw plaintiff in November 1993.  In light of the physical exam he conducted and plaintiff's medical history, Dr. Lubenow diagnosed plaintiff as having reflex sympathetic dystrophy (RSD).  He testified, "I believe that her condition did result from that blood draw."  Dr. Lubenow further testified:

"Well, the basis of my opinion would be that from a time frame standpoint, it all fits rather well.  We know she developed her left arm pain following the left arm draw.  It's known that she was seen in the emergency room for pain just a couple of days after that procedure.  Dr. LeMarre in his initial referral indicated that she had that and that was her history, and that was the reason that he had her get an EMG test to test for the muscle function of that arm.  And so all of those things served to form the reasons for I believe her condition resultant from that blood draw."

Dr. Hooshang Hooshmand's videotaped deposition was played before the jury.  Dr. Hooshmand saw plaintiff in August 1996.   Plaintiff's records revealed that in July 1996 she was diagnosed with a mild stage of RSD in her arm and neck.  Dr. Hooshmand diagnosed plaintiff as having "RSD due to insertion of needle into the vein and that had resulted in the series of unexpected complications."  

On cross-examination, defense counsel asked Dr. Hooshmand:   "Another example that I think you have used [in the past] to explain this concept [of venipuncture RSD] is like winning the reverse lotto; is that correct? ***  About a 1-in-6 million chance of getting this disease process?"  Dr. Hooshmand responded, "That's right."  Defense counsel also asked Dr. Hooshmand, "Doctor, do you have an opinion in this case whether the venipuncture was performed negligently?"  Dr. Hooshmand answered, "I cannot have an opinion because I was not there and I don't have any proof that there was negligence."  Defense counsel later asked, "It's your opinion in this case that the plaintiff was simply a very unfortunate lady who had a very tragic rare occurrence occur to her?"  Dr. Hooshmand, responded, "That's correct, sir."

Registered nurse Sabine Niedzwiecki testified as an expert regarding the standard of care for blood draw procedures.  She stated that one should ask the patient his or her arm preference, make sure that the vein was palpable or visible and ensure that it had "good bounce."  The drawer should then attempt to draw the blood, and if the patient complains of any type of pain, the drawer should immediately stop.  Relying on the account of events in plaintiff's deposition and Dr. Hooshmand's deposition, Nurse Niedzwiecki stated:

"I feel [the medical assistant] did not follow the standard of care. *** It was evident she did not locate a good vein.  To try to stick somebody just for the purpose of sticking is not part of the standard procedure.  Also the fanning and the redigging and the going back and forth is not appropriate according to the standard of care to attempt a blood specimen.  And I guess thirdly once a patient tells you to stop it hurts they're in charge, they're the boss, you have to-- you have to listen to them, you have to stop and she did not stop."

Medical assistant Theresa Chavez testified during the plaintiff's case in chief that, in the 13 years that she worked for Ingalls, she conducted approximately four to five blood draws daily.  She stated that she would never insert a needle into a patient's arm if she could not feel a vein.  She stated that while there is no set limit, it was her practice to attempt to find a vein "up to two times max on each arm."  Chavez testified that the plaintiff did not complain of any pain during the blood draw and, if she had, that would have been something that she would have recorded on plaintiff's medical chart.  Chavez recalled that plaintiff said "ouch" upon removal of the needle but did not otherwise complain.

At the close of plaintiff's evidence, Ingalls moved for a directed verdict on the ground that plaintiff failed to present any expert testimony establishing that the medical assistant's alleged breach of the standard of care proximately caused plaintiff's injury.  

At the hearing on the motion for a directed verdict, the trial court judge stated:

   "As we've discussed yesterday, there's no question in this case that the nurse expert has established that the vein puncture was negligently performed. *** Secondly, there's no question here that both doctors established that the venipuncture caused the RSD. *** The pivotal question is is it the proximate cause as required for the Plaintiff's case to stand.  Merely a cause, in fact, is not sufficient.

* * *

   And here the record speaks for itself and there is absolutely no expert testimony here connecting the negligently conducted venipuncture with the resulting RSD."  

Relying on 
Saxton v. Toole
, 240 Ill. App. 3d 204, 608 N.E.2d 233 (1992), the trial judge granted the defendant's motion for directed verdict on September 1, 2000.  Plaintiff now appeals.

ANALYSIS

Standard of Review

The appellate court reviews the grant of a directed verdict 
de
 
novo
.  
Susnis v. Radfar
, 317 Ill. App. 3d 817, 825, 739 N.E.2d 960 (2000).  A directed verdict will be affirmed where the evidence, viewed in the light most favorable to the plaintiff, so overwhelmingly favors the defendant that no contrary verdict based on that evidence could ever stand.  
Mort v. Walter
, 98 Ill. 2d 391, 396, 457 N.E.2d 18 (1983).  A directed verdict is appropriate where the plaintiff has not established a 
prima
 
facie
 case.  
Saxton
, 240 Ill. App. 3d at 210.
 

I

Plaintiff contends that she established that defendant's negligence was the proximate cause of her injury.  Upon appeal, plaintiff asserts that the injury would not have occurred if the needle had not been inserted into her left arm.  Defendant, on the other hand, contends that the plaintiff has not shown that any purported act of negligence caused her injury.  Defendant further contends that plaintiff's own experts negated any contention that her RSD was a likely consequence of the medical assistant's conduct.

In order to prove a case of negligence against a medical professional, the plaintiff must establish the following:  (1) proper standard of care against which the professional's conduct must be measured; (2) negligent failure to comply with the standard; and (3) the injury had as one of its proximate causes the negligence of the professional.  
Saxton
, 240 Ill. App. 3d at 210.  The plaintiff bears the burden of establishing each element.  
Saxton
, 240 Ill. App. 3d at 210. 

A p
laintiff sustains her burden by proving, generally through expert testimony, that defendant's breach of the applicable standard of care is more probable than not the cause of plaintiff's injury.  
Newell v. Corres
, 125 Ill. App. 3d 1087, 1092, 466 N.E.2d 1085 (1984)
.  The weight to be given to medical expert testimony is for the trier of fact to determine.  
Suttle v. Lake Forest Hospital
, 315 Ill. App. 3d 96, 103, 733 N.E.2d 726 (2000).  In the absence of expert testimony that an act by the defendant could have, within a reasonable degree of medical certainty, caused the plaintiff's injuries, it would be impossible for a jury verdict in plaintiff's favor to stand, and a directed verdict would be appropriate.  
Saxton
, 240 Ill. App. 3d at 210.  

In the instant case, plaintiff presented testimony from nurse Niedzwiecki which provided the standard of care for drawing blood.  Niedzwiecki also testified that she considered the blood draw performed on plaintiff to have been a breach of that standard of care.  The question upon appeal is whether plaintiff demonstrated that the blood draw was negligently performed and whether that negligence was the proximate cause of her injury.

Proximate cause is that cause which produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause.  
Block v. Lohan Associates, Inc.
, 269 Ill. App. 3d 745, 756, 645 N.E.2d 207 (1993).  Proximate cause is made up of two elements, cause in fact and legal cause.  
First Springfield Bank & Trust v. Galman
, 188 Ill. 2d 252, 257-58, 720 N.E.2d 1068 (1999).  Cause in fact exists where there is a reasonable certainty that a defendant's acts caused the injury or damage.  
First Springfield
, 188 Ill. 2d at 258.  Legal cause, by contrast, is essentially a question of foreseeability.  
First Springfield
, 188 Ill. 2d at 258.  Proximate cause is not established, however, where the causal connection is "'contingent, speculative or merely possible.'" 
Newell
, 125 Ill. App. 3d at 1092, quoting 
Manion v. Brant Oil Co.
, 85 Ill. App. 2d 129, 136, 229 N.E.2d 171 (1967).  

Plaintiff's argument upon appeal fails because while there is testimony that the medical assistant's actions breached the standard of care, there is no expert testimony that the breach of the standard of care was the cause of her injury.  Plaintiff failed to establish that the violation of the standard of care regarding the blood draw in her left arm was the legal cause of the RSD.  In fact, Dr. Hooshmand stated that the possibility of contracting RSD from a blood draw was a 1 in 6 million chance.  Assuming plaintiff's recount of the blood draw is true, there has been no evidence presented that the injury was a foreseeable result of the medical assistant's actions.  As the trial court correctly ruled, it is essential that plaintiff present expert testimony that establishes that the medical assistant's actions in drawing the blood was negligent and that the negligence caused this injury.

While relying on 
Suttle v. Lake Forest Hospital
, 315 Ill. App. 3d 96, 733 N.E.2d 726 (2000), plaintiff also asserts that the trial court improperly invaded the jury's role in determining proximate cause.  It is well established that issues involving proximate cause are fact specific and therefore uniquely for the jury's determination (
Holton v. Memorial Hospital
, 176 Ill. 2d 95, 107, 679 N.E.2d 1202 (1997)), unless there is no material issue regarding the matter or where only one conclusion is clearly evident (
Williams v. University of Chicago Hospitals
, 179 Ill. 2d 80, 84, 688 N.E.2d 130 (1997)).  Plaintiff asserts that the breach of the standard of care by the medical assistant, which was testified to by an expert nurse witness in plaintiff's case in chief, raises questions for the jury to decide.  We disagree.

In 
Suttle
, one issue involved the velamentous insertion of the umbilical cord into the placenta inside the plaintiff, Ms. Suttle, and injuries suffered by her newborn child.  The defendant
 contended that the plaintiff failed to prove proximate cause.  
Suttle
, 315 Ill. App. 3d at 98.  A treating physician testified that his treatment would have been the same regardless of whether he was aware of the velamentous insertion.  However, there was also testimony that the treating physician had diagnosed Ms. Suttle's newborn child as suffering from respiratory distress syndrome, rather than hypovolemic shock, because he was unaware of Ms. Suttle's velamentous insertion.  In 
Suttle
, the Illinois Appellate Court held that there remained a factual issue as to what the treating physician would have done had he known the condition of the placenta.  
Suttle
, 315 Ill. App. 3d at 104-05.

In the instant case, the issue is whether, as a matter of law, plaintiff has established that her injuries were proximately caused by the negligence of defendant's phlebotomist, Theresa Chavez.  In our view, plaintiff has not met that burden.  No medical testimony has been adduced to establish to a reasonable degree of medical certainty that the RSD or "complex regional pain syndrome" that plaintiff suffers was the result of the negligence of the medical assistant's actions.  See 
Pedrick v. Peoria & Eastern R.R. Co.
, 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967). 

For the foregoing reasons, the trial court's grant of the directed verdict in favor of defendant is affirmed.

Affirmed.

CAHILL, P.J., and McBRIDE, J., concur.