2020 IL App (1st) 182444-U

FOURTH DIVISION
February 20, 2020

No. 1-18-2444

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

|  |  |  |
|---|---|---|
| ROBERTO NIEVES, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| PRESENCE SAINTS MARY AND ELIZABETH MEDICAL CENTER, a not-for-profit Illinois corporation, | ) ) ) ) | No. 14 L 10064 |
| Defendant-Appellee, | ) ) ) | |
| (Presence Healthcare Services d/b/a Presence Medical Group and d/b/a Presence Medical Group-RHC, a not-for-profit Illinois corporation, Saints Mary and Elizabeth Hospital, a not-for-profit Illinois Corporation, Rajagopal Reddy, M.D. and Namit Aggarwal, M.D., | ) ) ) ) ) ) | Honorable Daniel J. Lynch, Judge Presiding. |
| Defendants). | ) ) ) ) | |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Gordon and Justice Burke concurred in the judgment.


**ORDER**

¶ 1    *Held*:    Affirming the judgment of the circuit court of Cook County directing a verdict in favor of the defendant hospital at the close of the plaintiff's case where the plaintiff failed to present any evidence as to the element of proximate cause.

¶ 2    Plaintiff Roberto Nieves brought a medical malpractice action in the circuit court of Cook County.  Pertinent to this appeal, plaintiff named as defendants Presence Saints Mary and Elizabeth Hospital (the hospital) and Dr. Rajagopal Reddy and Dr. Namit Aggarwal.  Plaintiff claimed that the hospital, through one of its nurses, and Drs. Reddy and Aggarwal were negligent when they failed to timely diagnose a retroperitoneal hematoma and that this failure caused him numerous injuries.  At the close of plaintiff's evidence, the trial court entered a directed verdict for the hospital finding plaintiff failed to present sufficient evidence establishing that the nurse's deviation from the standard of care proximately caused plaintiff's injuries.  The trial court subsequently entered judgment on a jury verdict in favor of Dr. Reddy and Dr. Aggarwal.

¶ 3    On appeal, plaintiff raises the sole contention that the trial court erred in entering a directed verdict in favor of the hospital.  For the following reasons, we affirm.

¶ 4                                              BACKGROUND

¶ 5    At the October 2018 jury trial, the following evidence was adduced.  On September 27, 2012, plaintiff was admitted to the hospital where Dr. Reddy, an interventional cardiologist, diagnosed him with a heart attack.  The following day, Dr. Reddy performed a cardiac catheterization (also known as an angioplasty) on plaintiff.  This procedure involved entering the femoral artery at plaintiff's groin, advancing a catheter towards his heart to detect any blockages, and inserting a stent to restore blood flow to his heart.  The catheter was then removed and the entry site was sealed.

¶ 6    After the angioplasty, plaintiff was admitted to the intensive care unit at 3:15 p.m.  Nurse Christine Augustyniak was assigned to care for plaintiff.  At that time plaintiff did not complain

of pain and his vital signs were normal. Pursuant to the hospital's standard procedure after an angioplasty, plaintiff was connected to machines that recorded continual measurements of his heart rate and blood oxygen level. Plaintiff was also observed by the nurse and his blood pressure was taken every 15 minutes.

¶ 7    According to the testimony of plaintiff's son, Roberto Nieves, Jr. (Roberto), at 3:30 p.m. plaintiff began experiencing pain on his right side by his groin as well as on the right side of his stomach and back. Roberto notified the nurse that his father "was complaining about discomfort." Nurse Augustyniak came to plaintiff's bedside where plaintiff informed her that he was experiencing lower abdominal discomfort and the need to urgently void urine and have a bowel movement. Nurse Augustyniak testified that plaintiff "didn't complain of pain to me" and as a result there was no mention in the medical records of pain. At that point in time, plaintiff's vital signs were within the normal range.

¶ 8    At 3:45 p.m., plaintiff was unable to have a bowel movement but did void some urine. Although his vital signs remained within the normal range, including a blood oxygen level of 100%, nurse Augustyniak initiated a telephone call to Dr. Aggarwal, the critical care physician assigned to the intensive care unit, to inform him of plaintiff's condition. Dr. Aggarwal testified he could not recall the specifics of this conversation; however, Dr. Aggarwal's initial notes indicated he was " 'Called to bedside for patient with moderate distress. Unable to pass urine. Cold, clammy, diaphoretic, likely vagal, post cath.' " At 3:45 p.m., Dr. Aggarwal also discontinued the administration of Integrilin (an antiplatelet agent) to plaintiff. According to Dr. Aggarwal, Integrilin is an anticoagulant medication that is typically administered to a patient for 12-18 hours after an angioplasty to prevent blood clots from forming. Dr. Aggarwal further testified that nurse Augustyniak did not inform him that plaintiff was in pain. Meanwhile,

attempts were made to insert a catheter into plaintiff, but those attempts were unsuccessful.

¶ 9    When Dr. Aggarwal arrived at plaintiff's bedside at 4 p.m., plaintiff's heart rate had increased from 56 beats per minute at 3:15 p.m. to 84 beats per minute and his mean arterial pressure fluctuated but remained within normal range. Dr. Aggarwal could not obtain a pulse oxygen reading and therefore believed plaintiff's hemodynamic stability was questionable. Dr. Aggarwal examined plaintiff and found him to be agitated, uncomfortable, and diaphoretic (sweaty). Plaintiff informed Dr. Aggarwal that he had pain in his pelvis or lower abdominal area and that he needed to urinate and have a bowel movement. At this moment, it was unclear to Dr. Aggarwal whether plaintiff's pain was related to his need to urinate and have a bowel movement. Plaintiff's chart also indicated a pain score of zero out of 10.

¶ 10    After examining plaintiff, Dr. Aggarwal believed plaintiff was experiencing a vasovagal response. According to Dr. Aggarwal, a vasovagal response is when one's nervous system, which regulates heart rate and blood pressure, malfunctions or reacts in response to some trigger. Common triggers for a vasovagal response include "difficulty voiding either urinary or bowel." Dr. Aggarwal indicated, however, that pelvic pain and low oxygen saturations were not typical of a vasovagal response. Dr. Aggarwal further testified that he did not suspect plaintiff was experiencing an internal bleed at 4 p.m. because his heart rate and blood pressure "were not significantly in a range that would make me think that, and his symptoms were also not what I would classically describe as something that would be a bleed post this type of procedure. But his respiratory distress was something that I thought could be related to, possibly, an acute deterioration of his heart function." Dr. Aggarwal then contacted Dr. Reddy by telephone and communicated plaintiff's symptoms to him. The doctors decided to intubate plaintiff out of concern that the stress could cause a worsening of his coronary artery disease. Dr. Aggarwal

also testified that if he had arrived at plaintiff's bedside earlier, he would not have treated plaintiff any differently because he acted to intubate plaintiff primarily based on the lack of a pulse oxygen reading.

¶ 11    At 4:30 p.m., Dr. Reddy was at plaintiff's bedside. Plaintiff's heart rate and blood pressure were within normal range; however, plaintiff was not hemodynamically stable because the doctors still could not obtain a pulse oxygen reading. Dr. Reddy observed that plaintiff was cold, clammy, pale, diaphoretic, and he believed plaintiff was in shock. At this point, Dr. Reddy did not believe plaintiff was experiencing vasovagal shock but instead suspected hypovolemic shock (a loss of blood that can lead to acute renal failure due to lack of blood to the kidney). Accordingly, Dr. Reddy ordered a blood count on plaintiff. Dr. Aggarwal put in central and arterial lines to assist in stabilizing plaintiff. At 5:01 p.m., plaintiff's blood test revealed a hemoglobin level of 10.9, lower than the normal range of 13-17. At this time, Dr. Reddy had a suspicion that plaintiff could have a retroperitoneal hematoma (a collection of fluid in the retroperitoneal space, *i.e.,* the flanks going up either side of the body) but could not substantiate his suspicion without another blood test that indicated a decrease in hemoglobin and a CT scan.

¶ 12    Meanwhile, to rule out septic shock (which can express itself through the failure of the patient to create urine or have decreased urine output), Dr. Reddy called for Dr. Thomas Malvar, a urologist. At 5:45 p.m. Dr. Malvar successfully inserted the catheter. At 5:46 p.m., a second blood test indicated that plaintiff's hemoglobin level was 9.5. At 6 p.m., Dr. Malvar performed a cystogram on plaintiff which revealed the presence of fluid that was squeezing the bladder into an elongated (as opposed to its typically round) shape. Dr. Malvar suspected a retroperitoneal hematoma was likely and believed plaintiff's ureters might also be compressed by the hematoma. Accordingly, Dr. Malvar performed a cystoscopy where he introduced a device with a camera

attached into the catheter to observe the ureters. Upon doing so, urine came out of the catheter and led Dr. Malvar to conclude that the ureters were likely being obstructed by the retroperitoneal hematoma.

¶ 13    Thereafter, at 6:05 p.m., a CT scan of plaintiff's abdomen was ordered. The physicians obtained the results of the CT scan at 6:37 p.m. which confirmed the presence of a retroperitoneal hematoma. Dr. Reddy testified that the bleeding pattern of plaintiff's retroperitoneal hematoma was "very rare" and that it was "very unusual to have a pelvic hematoma" which is why they did not suspect it. Emergency surgery to repair the two laceration sites on the femoral artery and evacuate the blood from retroperitoneal space was conducted by Dr. Nazir Ahmad Khan at 8:05 p.m.

¶ 14    As a result of the retroperitoneal hematoma, plaintiff remained at the hospital until November 20, 2012. He thereafter suffered numerous injuries including a fistula (the leaking of intestinal content into the abdominal cavity) and needed a colostomy bag. Plaintiff was admitted multiple times the hospital for infections, pain, colitis, swelling, and bleeding at the fistula site. The fistula was removed via surgery; however, a second fistula formed. Plaintiff's condition was alleviated when Dr. Anders Mellgren removed a portion of his intestine in 2017. Plaintiff also experienced kidney injuries.

¶ 15    Regarding the nursing standard of care, plaintiff introduced the expert testimony of registered nurse Keith Gebke. He testified that "[t]he standard of care for this case would be that the patient is monitored for vital signs, signs of bleeding and pain, which would be part – and then relay that message to the physician if there's any abnormalities found." Based on the depositions of plaintiff and his son, Roberto, Gebke opined that nurse Augustyniak did not follow the standard of care because she did not document or report that plaintiff "was in severe

pain and that he was diaphoretic at 3:35 p.m." Gebke testified that nurse Augustyniak should have contacted a physician "whenever [plaintiff] had the first drop in blood pressure at 3:30 and he was complaining of severe pain." Gebke explained that while plaintiff's heart rate and blood pressure were "not concerning" at 3:15 p.m., the next set of vital signs obtained at 3:30 p.m. indicated his blood pressure dropped from 110/77 to 90/67 and his heart rate increased from 56 to 66 beats per minute. Gebke opined that this 20% fluctuation "is concerning" and should lead a nurse to believe that there is "some type of blood loss" occurring. Gebke did not offer an opinion as to whether nurse Augustyniak's failure to report plaintiff's pain to a physician caused plaintiff any injury.

¶ 16 On cross-examination, Gebke admitted that nurse Augustyniak contacted a physician at 3:45 p.m. He also admitted that he has never cared for a patient who has had an angioplasty and then developed a retroperitoneal hematoma. Gebke acknowledged that at 3:30 p.m. plaintiff's heart rate was not elevated and plaintiff's blood pressure and respiratory rate were normal. Gebke further acknowledged that nurse Augustyniak would be monitoring plaintiff's heart rate and oxygen saturation rates in real time as she cared for plaintiff. Gebke also opined that based on plaintiff's vital signs at 3:30 p.m. it was reasonable for nurse Augustyniak to continue to monitor the patient and if he had any abnormal symptoms to call a physician, which she did 10 minutes later.

¶ 17 On redirect, Gebke testified that pain would not be indicative of shock, but it also would not be expected after an angioplasty. Accordingly, based upon the presentation of pain, the "other symptoms," and plaintiff's vital signs, nurse Augustyniak should have contacted a physician.

¶ 18 Dr. James Boffa, a physician board certified in general surgery, testified as plaintiff's

medical expert. Based on his review of plaintiff's medical records from September 28, 2012, Dr. Boffa opined that Dr. Aggarwal and Dr. Reddy failed to make a timely diagnosis of plaintiff's retroperitoneal hematoma. Dr. Boffa opined that a CT scan of plaintiff's abdomen should have been done "around 4 o'clock" and that the fact it took the physicians three hours and seven minutes to diagnose plaintiff was a deviation from the standard of care. According to Dr. Boffa, the physicians further deviated from the standard of care when five hours passed before plaintiff had emergency surgery. Dr. Boffa, however, also testified, "You only have a period of less than six hours to make the diagnosis and treat so that you can relieve the pressure." Dr. Boffa opined that this failure caused plaintiff extensive injuries because as the retroperitoneal hematoma expanded it put pressure on the abdominal compartment cutting off the blood flow to the intestine and the ureters. This caused a portion of plaintiff's intestine to develop ischemia (death) of the bowel wall and caused him to suffer kidney damage.

¶ 19     When asked if he had an opinion as to whether nurse Augustyniak's actions caused or contributed to the injuries suffered by plaintiff, Dr. Boffa responded "yes." When asked his opinion as to why that was the case, Dr. Boffa stated, "That she failed to notify the physician of a change in the patient's condition." No further explanation was provided.

¶ 20     On cross-examination, Dr. Boffa admitted that at 4 p.m. two signs of a retroperitoneal hematoma (high heart rate and low blood pressure) were not present. He further acknowledged that as a physician one cannot speculate as to a patient's condition but must first assess the patient. He also agreed that it was proper for Dr. Aggarwal to intubate plaintiff and put in a central line. While he disagreed with Dr. Aggarwal regarding whether the arterial line was necessary, he conceded that the placement of the arterial line was reasonable in this instance. Dr. Boffa further testified that if nurse Augustyniak had assessed plaintiff at 3:30 p.m., called Dr.

Aggarwal at 3:45 p.m., and provided Dr. Aggarwal with a history and he stopped the Integrilin at 3:45, then her actions did not cause plaintiff injury.

¶ 21    At the close of plaintiff's evidence, the hospital moved for a directed verdict. Pertinent to this appeal, the hospital argued it was entitled to a directed verdict as to plaintiff's claims of negligence against nurse Augustyniak because plaintiff failed to establish a causal connection between nurse Augustyniak's alleged negligence and plaintiff's injury. The hospital observed that plaintiff's medical expert Dr. Boffa ultimately conceded that nurse Augustyniak's conduct did not cause plaintiff's injury thus plaintiff failed to present any evidence as to proximate cause. In response, plaintiff maintained that a directed verdict was improper where plaintiff, Roberto, and plaintiff's brother testified about plaintiff's pain and that nurse Augustyniak failed to communicate plaintiff's pain to Dr. Aggarwal. Plaintiff argued that this testimony along with the testimony that flank pain is a classic symptom of a retroperitoneal hematoma established a causal connection between nurse Augustyniak's deviation from the standard of care and plaintiff's injuries.

¶ 22    After hearing argument on the motion, the trial court entered a directed verdict in favor of the hospital. In directing the verdict, the trial court found that there was no testimony creating a causal link between nurse Augustyniak's alleged negligence and plaintiff's injury where Dr. Boffa opined that causation commenced at 4 p.m. when Dr. Aggarwal was at plaintiff's bedside. The trial court explained that plaintiff's evidence demonstrated that at 4 p.m. Dr. Aggarwal was fully aware of plaintiff's symptoms, including his pain, and began treating plaintiff with an eye towards surgery. The trial court based this determination on Dr. Boffa's testimony that plaintiff "needed to be taken forward towards surgery with all the attendant confirmation before that with the CT scan" at 4 p.m.

¶ 23     The matter proceeded and the remaining defendants presented their case-in-chief. At the close of evidence, the jury deliberated and returned a verdict in favor of those defendants. Plaintiff filed a motion for a new trial, which was denied. The trial court then entered judgment on the verdict. This appeal followed.

¶ 24                                   ANALYSIS

¶ 25     On appeal, plaintiff contends that the trial court erred in entering a directed verdict in favor of the hospital because he presented sufficient evidence that nurse Augustyniak's negligence proximately caused his injuries. "In directing a verdict, the trial court determines as a matter of law that there are no evidentiary facts out of which the jury may construe the necessary fact essential to recovery." *Jones v. O'Young*, 154 Ill. 2d 39, 47 (1992). Our review of a trial court's directed verdict is thus *de novo*. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 112 (2004). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP,* 408 Ill. App. 3d 564, 578 (2011).

¶ 26     A directed verdict will be upheld where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). A directed verdict in favor of a defendant is appropriate when the plaintiff has not established a *prima facie* case. *Sullivan*, 209 Ill. 2d at 123. A plaintiff must present at least some evidence on every essential element of the cause of action or the defendant is entitled to judgment in his or her favor as a matter of law. *Nastasi v. United Mine Workers of America Union Hospital*, 209 Ill. App. 3d 830, 837 (1991). If the plaintiff fails to produce a required element of proof in support of her cause of action, then no cause is presented for the jury's consideration and the entry of a directed verdict for the defendant is proper. *Mayer v.*

*Baisier*, 147 Ill. App. 3d 150, 155 (1986).

¶ 27    In a negligence medical malpractice case, the burden is on the plaintiff to establish the following:  (1) proper standard of care against which the medical professional's conduct must be measured; (2) negligent failure to comply with the standard; and (3) the injury had as one of its proximate causes the negligence of the professional.  *Mengelson v. Ingalls Health Ventures*, 323 Ill. App. 3d 69, 74 (2001).  A plaintiff satisfies this burden by providing that defendant's breach of the applicable standard of care is more probable than not the cause of plaintiff's injury.  *Id.* Because jurors are not skilled medical professionals, a plaintiff must present expert testimony to establish these elements.  *Saxton v. Toole*, 240 Ill. App. 3d 204, 210 (1992).  "In the absence of expert testimony that any act by the defendant could be said, within a reasonable degree of medical certainty, to have caused the plaintiff's injuries, it would be impossible for a jury verdict in plaintiff's favor to stand, and a directed verdict would be appropriate."  *Id.*  A mere possibility is not sufficient to sustain the burden of proof of proximate cause.  *Krivanec v. Abramowitz*, 366 Ill. App. 3d 350, 359 (2006).  The causal connection must not be contingent, speculative, or merely possible.  *Id.*

¶ 28    Plaintiff maintains that the trial court erred in directing a verdict in the hospital's favor where:  (1) the evidence presented demonstrated nurse Augustyniak proximately caused plaintiff's injury; (2) factual and credibility determinations existed surrounding whether plaintiff was experiencing pain at 3:30 p.m. that the jury should have decided; and (3) Dr. Aggarwal's testimony that he would have not have acted differently if he had been called earlier does not defeat proximate causation.

¶ 29    In response, the hospital asserts that the trial court correctly granted its motion for a directed verdict due to the absence of evidence that nurse Augustyniak's negligence proximately

caused plaintiff's injury. The hospital maintains that plaintiff did not present any expert testimony that nurse Augustyniak's alleged 10-minute delay in notifying a physician of plaintiff's pain proximately caused or contributed to plaintiff's injury. The hospital further observes that plaintiff fails to support his arguments with citations to the record and improperly relies on lay witness testimony to support his proximate causation argument.

¶ 30    Plaintiff argues that nurse Augustyniak's failure to inform Dr. Aggarwal of plaintiff's pain proximately caused him injury because Dr. Aggarwal "acted on incomplete information" as was the case in *Holton v. Memorial Hospital*, 176 Ill. 2d 95 (1997). We find plaintiff's reliance on *Holton* to be misplaced. In *Holton*, the plaintiff alleged the nurses failed to notify her physicians of paralysis in her leg and therefore this negligence deprived the plaintiff's physicians of an opportunity to correctly diagnose and treat her fractured vertebra. *Id.* at 110. Our supreme court held that the plaintiff established proximate cause where there was evidence that had the treating doctors been given an opportunity to properly diagnose the plaintiff's condition based on accurate and complete information from the hospital staff, they would have had the opportunity to treat her condition by ordering the appropriate treatment. Because the hospital staff negligently failed to accurately and timely report the plaintiff's symptoms to the treating doctors, the appropriate treatment could not even be considered. *Id.* at 108.

¶ 31    Here, in contrast, there was no evidence adduced at trial from which the jury could find that nurse Augustyniak's negligence deprived Dr. Aggarwal of an opportunity to properly diagnose and treat plaintiff. Dr. Boffa, in fact, testified that causation did not commence in this matter until 4 p.m. when Dr. Aggarwal arrived at plaintiff's bedside. Moreover, it was undisputed that plaintiff was hemodynamically stable until Dr. Aggarwal arrived. Based on this, Dr. Aggarwal testified that he did not believe that plaintiff's condition required the nurse to

contact him prior to 4 p.m. when plaintiff began to deteriorate.  Once Dr. Aggarwal was at plaintiff's bedside, Dr. Aggarwal had the opportunity to assess plaintiff's condition, including his pain.  Knowing all of plaintiff's symptoms, Dr. Aggarwal believed plaintiff was experiencing a vasovagal response and treated plaintiff accordingly.  Dr. Aggarwal testified that his medical decisions were not motivated by plaintiff's pain, but by plaintiff's hemodynamic instability and the lack of a pulse oxygen reading.  Thus, according to Dr. Aggarwal, any claimed failure by nurse Augustyniak to communicate plaintiff's pain to Dr. Aggarwal would not have changed his course of treatment.  Furthermore, there was no evidence to suggest that Dr. Aggarwal lacked the necessary information to make an informed diagnosis and to treat plaintiff accordingly.  See *Krivanec*, 366 Ill. App. 3d at 359.

¶ 32     Plaintiff similarly relies on *Northern Trust Co. v. University of Chicago Hospitals and Clinics*, 355 Ill. App. 3d 230 (2004), and *Hemminger v. LeMay*, 2014 IL App (3d) 120392, to support his position that the trial court's directed verdict should be reversed.  We find these cases to be inapposite because, unlike in the case at bar, the plaintiffs in *Northern Trust* and *Hemminger* presented the appropriate evidence of proximate cause to overcome a directed verdict.  See *Northern Trust Co.*, 355 Ill. App. 3d at 244; *Hemminger*, 2014 IL App (3d) 120392, ¶¶ 19-20.

¶ 33     In the instant case, we conclude plaintiff failed to present any evidence on the element of proximate cause as it related to nurse Augustyniak's conduct.  Our review of the record reflects that plaintiff's counsel never questioned its nursing expert Gebke about whether nurse Augustyniak's supposed violation of the standard of care proximately caused plaintiff's injury.  While plaintiff's counsel questioned Dr. Boffa regarding whether he had an opinion on whether nurse Augustyniak's actions caused or contributed to plaintiff's injury, Dr. Boffa answered only

that "she failed to notify the physician of a change in the plaintiff's condition." Dr. Boffa did not elaborate on what the change was or how that change caused or contributed to plaintiff's injury. See *Susnis ex rel. Susnis v. Radfar*, 317 Ill. App. 3d 817, 827 (2000) ("The mere possibility of a causal connection is not sufficient to sustain the burden of proof of proximate cause."). We thus agree with the trial court's assessment that this testimony amounts to vague and unfounded standard of care testimony offered by a physician. See *Sullivan*, 209 Ill. 2d at 119 (holding a medical doctor was "not competent to testify regarding the standard of care for the nursing profession and nurse Lewis' deviations therefrom."). As plaintiff here failed to elicit any testimony as to how the delay resulted in injury to plaintiff, the element of proximate cause has not been established and the trial court correctly directed a verdict in the hospital's favor.

¶ 34    Plaintiff, however, contends that this case turns on factual disputes and credibility determinations that would preclude a directed verdict. We disagree. While issues involving proximate cause are fact specific and therefore uniquely for the jury's determination, if there is no material issue regarding the matter or only one conclusion is evident, the question of proximate cause can be determined as a matter of law. See *Mengelson*, 323 Ill. App. 3d at 75-76. No medical testimony was adduced to establish to a reasonable degree of medical certainty that the injuries caused by the retroperitoneal hematoma were the result of nurse Augustyniak's failure to disclose plaintiff's pain to Dr. Aggarwal. See *id.* at 76. Thus, the trial court properly determined the issue of proximate causation as a matter of law.

¶ 35    Plaintiff further urges this court to discredit Dr. Aggarwal's testimony that had he been notified earlier he would not have treated plaintiff differently. Plaintiff maintains that such testimony cannot defeat proximate causation relying on *Snelson v. Kamm*, 204 Ill. 2d 1 (2003) and *Buck v. Charletta*, 2013 IL App (1st) 122144. These cases fail to support plaintiff's position.

First, we decline to find *Buck* is applicable to the case at bar where it involved a motion for summary judgment and our appellate court concluded that a genuine issue of material fact existed regarding proximate causation. *Buck*, 2013 IL App (1st) 122144, ¶¶ 58, 73. Second, plaintiff's reliance on *Snelson* for the proposition that testimony from the treating doctor does not *per se* defeat proximate causation is also misplaced as *Snelson* actually supports our conclusion herein.

¶ 36    In *Snelson*, the trial court entered a judgment notwithstanding the verdict in favor of the defendant hospital on the issue of proximate cause. *Snelson*, 204 Ill. 2d at 9. One of the issues before our supreme court was whether proximate cause was sufficiently established by the evidence. *Id.* at 42. In affirming the judgment of the trial court as to this question, the supreme court observed that the plaintiff "acknowledges that he presented no expert testimony indicating that [the hospital's] conduct was the proximate cause of his injury" and that the treating physician "testified that no act or omission of the nursing staff affected his course of treatment" of the plaintiff. *Id.*

¶ 37    Our supreme court found that while the nursing expert testified to eight specific deviations from the standard of care, there was no evidence presented that established that any of these deviations proximately caused the plaintiff's injury. *Id.* at 43-44. In reaching this conclusion, our supreme court stated, "[The nursing expert] also testified that she was critical of the nursing staff's apparent failure to take Snelson's vital signs at 10 p.m. Snelson, however, *does not explain how* the failure to take vital signs at 10 p.m. helped to cause his injury." (Emphasis added.) *Id.* at 44. This statement supports our determination herein, that plaintiff failed to establish proximate cause where Dr. Boffa did not explain how nurse Augustyniak's alleged deviation from the standard of care proximately caused plaintiff's injury.

¶ 38 Because the record is devoid of any evidence on this essential element of plaintiff's claim, no cause was presented for the jury's consideration, and the entry of a directed verdict for the hospital was proper. See *Mengelson*, 323 Ill. App. 3d at 75; *Saxon*, 240 Ill. App. 3d at 211.[1]

¶ 39                                  CONCLUSION

¶ 40 For the reasons stated above, the judgment of the trial court is affirmed.

¶ 41 Affirmed.

---

[1] Based on our disposition of this matter, we need not address the hospital's arguments premised on the ramifications of a hypothetical new trial had we reversed the trial court's directed verdict.