2020 IL App (1st) 181840

THIRD DIVISION
September 30, 2020

No. 1-18-1840

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| 4220 KILDARE, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | Nos. 10 L 010065 & |
| | ) | 16 L 010618 |
| | ) | |
| REGENT INSURANCE COMPANY, | ) | Honorable |
| | ) | Thomas R. Mulroy, |
| Defendant-Appellee. | ) | Judge Presiding. |
| | ) | |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice Burke concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiff, 4220 Kildare, LLC (Kildare) made a claim on the all risk insurance policy provided by Kildare's insurer, defendant, Regent Insurance Company (Regent). Regent denied the claim in part based on the insurance policy's "Earth Movement Exclusion," a provision that excluded coverage for losses due to the freezing and expansion of soil underground. The case proceeded to a jury trial, and after both parties rested, Regent moved for a directed verdict. The trial court reserved ruling on the motion and submitted the case to the jury, which returned a verdict in favor of Kildare. Regent subsequently filed a motion for judgment notwithstanding the verdict (JNOV), and the parties filed briefs on Regent's motion for directed verdict. Thereafter, the trial

court granted Regent's motion for a directed verdict on the earth movement exclusion or, in the alternative, Regent's motion for JNOV, vacating the jury verdict. The court concluded that the policy's earth movement exclusion was unambiguous and that coverage for the loss was expressly barred by that exclusion. In this appeal, Kildare challenges that judgment.

¶ 2 The record shows that Kildare was the owner of a refrigerated warehouse building in Chicago, which contained large freezer rooms for the storage of food. In March 2009, Kildare, through its insurance agent, notified Regent of property loss to the floor of one of its freezer rooms. On August 14, 2009, Regent notified Kildare that it was denying the claim. Regent claimed that several exclusions eliminated coverage for the loss, including the policy's "Earth Movement" exclusion, based on Regent's determination that the damage to the floor resulted from "earth rising, sinking and/or shifting including soil conditions which caused disarrangement of the foundation *** including contraction, expansion, freezing, thawing, erosion, and the action of water under the ground surface." Kildare filed a proof of loss statement on April 28, 2010, seeking coverage for a "freezer concrete floor loss" that occurred on September 8, 2008, caused by "icing up of evaporators in K Freezer over holiday weekend." Regent reiterated its denial of coverage in a letter dated April 29, 2010.

¶ 3 On September 1, 2010, Kildare filed a two-count complaint against Regent alleging breach of contract and seeking a declaratory judgment. Kildare sought a declaration that the loss was covered under the insurance policy and that no exclusions applied, and damages in the amount of $722,111. Kildare alleged that, on or about September 8, 2008, a door to one of its freezer rooms, identified as "Freezer K," was left open over a long weekend, "which caused humid air to enter the freezer and adjacent spaces." As a result "of the door being left open and the permeation of humidity into the frozen substructure of the Property, the floor to Freezer K was substantially

2

damaged." Kildare's complaint was voluntarily dismissed in October 2015 and subsequently refiled in October 2016.

¶ 4     The case proceeded to a jury trial in June 2018.

¶ 5     At trial, Kildare submitted evidence showing that on or about September 8, 2008, someone left a door open to Freezer K over a long weekend. Bob Jaydos, the "director of facilities construction management [and] project management" for Kildare, testified that he received a call from the tenant complaining that there was a problem with the temperature in Freezer K. When Jaydos went to Freezer K, he saw "snow all over the place." There were several inches of frost and ice covering the ceiling, and the coils on the ceiling that refrigerated the room were "all frozen up." In Jaydos's experience, these observations were consistent with a door to the freezer being left open, which allowed humidity inside the freezer room.

¶ 6     Jaydos called a refrigeration contractor who spent six days "chipping out ice and getting these things back up and running; checking motors, getting the fans all going, and making sure that we got the whole system back up and running." During this removal process, Jaydos observed that ice was melting and water was dripping. After the ice was removed, Freezer K was "back to getting cold temperatures" and "it was back to business as usual."

¶ 7     Thereafter, in December 2008, Jaydos went to look at the floor of Freezer K. Jaydos noticed a "little bit of deflection" in the floor. He decided to monitor it, and over January and February, the deflection continued to get worse.

¶ 8     In March 2009, Jaydos hired Ralph Schmidt of Schmidt Engineering Services to remediate the rise in the floor. At Schmidt's direction, they opened up four sections of the floor and put large heaters under the floor. The floor began to settle back down around a month-and-a-half after the heaters were placed, and it took about three months for the floor to settle completely.

¶ 9     Jaydos testified that he observed the core samples, later identified as samples taken by drilling through the concrete and insulation with a saw, that were taken of the floor in Freezer K. Jaydos observed that the insulation below the floor was saturated with water and there was ice inside of the insulation. Jaydos realized at that point that they would have to replace the insulation. Jaydos testified that the insulation was the "first line of defense to restrict the movement of cold *** temperatures down into the crawl space and subsurface." Thereafter, Kildare demolished the floor slab and replaced the insulation. When asked whether it would have been possible to repair the insulation without demolishing the floor slab, Jaydos answered, "Absolutely not."

¶ 10     John Daley, the owner of the Kildare building, testified to the expenses incurred by Kildare in connection with their insurance claim and identified several invoices. Specifically, Daley testified that Kildare paid, in total, $398,740 to repair the damage in Freezer K and lost rent in the amount of $340,366 for the time that the tenant was required to move out of the space due to the damage. The repair expenses included, among other things, $3667.50 for the initial defrosting of the refrigeration coils, $8750 to Schmidt Engineering Services for investigation and recommendations, $83,581 for the demolition of the floor slab, $278,800 to replace the insulation and reconstruct the floor slab, and $5309 for the management of the project. Kildare also paid $14,400 for the heaters used in the crawl space. Daley also confirmed that the floor slab had to be demolished to replace the damaged insulation.

¶ 11     Schmidt testified that he is an engineer and was employed by Kildare to investigate the damage. Schmidt investigated core samples that were done of the floor and insulation and observed that the insulation was "saturated wet" and "damaged." Schmidt recommended to Kildare that the floor needed to be demolished and both the insulation and concrete slab needed to be replaced.

Schmidt further testified that at the point when he determined that the insulation was soaked, he would have recommended that the insulation be replaced, even if the floor had been flat.

¶ 12     Steven Sanders testified as an expert for Kildare. Sanders testified that he had a "Bachelor's Degree in mechanical engineering *** [and a] Master's Degree in mechanical and aerospace engineering," and he specialized in "thermal fluid sciences," *i.e.*, "heat transfer, thermodynamics and fluid mechanics." Sanders testified that, specifically, he specialized in "HVAC and refrigeration and building piping systems" and, when things went wrong with such systems, he "get[s] called in to figure out just what happened."

¶ 13     In this case, Sanders investigated the interior and exterior of the building, including the ventilation tunnels under the floor. In investigating the ventilation system, including the fans and heaters, Sanders did not notice any maintenance issues and noted that the motors were "in good working order." Sanders also examined an adjoining freezer room, Freezer M, to investigate the suggestion by Regent that the ventilation system failed. Sanders investigated core samples from both Freezer K and Freezer M. The core sample from Freezer K revealed "a significant amount of moisture present" and that the insulation was "saturated." The core sample taken from Freezer M, however, showed that the insulation was dry. Sanders concluded that Regent's explanation regarding the ventilation system "really didn't make sense" because both freezer rooms were "built the same way" and shared the same ventilation system, but there was "no reported heaving or freezing of the soil under [Freezer] M" or the same "heavy, heavy frost and ice build-up [that was found] under [Freezer] K." Sanders further opined that if "the entire ventilation system failed, [or] it wasn't working appropriately, we would have expected the freezing that we saw under [Freezer] K to also occur under [Freezer] M and we didn't see that." Sanders concluded that there "was no

problem with [the ventilation system]. It was really the compromised insulation that allowed everything to freeze underneath."

¶ 14    Based on his investigations, Sanders testified to several opinions, including that "water *** penetrat[ed] the floor and compromised the insulation of the floor [which] reduce[d] its insulation value, its thermal effectiveness *** allow[ing] the concrete underneath and the concrete footings, the temperature of those to drop and then the soil around the footings to freeze." Sanders further stated that the source of the water in the insulation was "due to an event where the big bay doors to the refrigerator warehouse were left open over a span of a period of days [which caused] a ton of ice and frost [to] accumulate[ ] within this large warehouse." Sanders opined that the ice and frost "melted after the event when they were de-icing it and went down to the floor and got through the cracks in the concrete floor and saturated the insulation." Sanders also stated that the "freezer floor heaved [because] the soil underneath the footings of the freezer actually froze," which "pushed up on the footings and raised the footings, raised the floor." Finally, Sanders opined that the ventilation system was operational and that the "freezing and heaving did not occur due to a failure or improper operation of the ventilation system that was underneath the floor and kept the floor from freezing."

¶ 15    At the conclusion of Kildare's case, Regent made an oral motion for a directed verdict, claiming that Kildare had not proven that the doors had been left open and that the earth movement exclusion was proven because Kildare's experts had testified about the soil freezing and expanding, which caused the uplift. The trial court denied that motion.

¶ 16    In Regent's case-in-chief, it presented the testimony of several witnesses, including expert witnesses, who opined that the damage did not occur as a result of doors to Freezer K being left open, that the insulation was functioning as intended, and that the cause of the floor heaving was

an improperly functioning ventilation system and Kildare's failure to properly provide heat in the crawl space under Freezer K. Harry Allen, a structural engineer hired by Regent to investigate the claim, determined "that the soil underneath the footings that support the floor froze" "[a]nd as the soil froze, it expanded, and the footings started raising." Allen opined that the reason for the soil freezing was that the crawl space underneath the freezer was not ventilated properly. Likewise, Ronald Vallort, a consultant with experience in the design, maintenance, and troubleshooting of refrigerated facilities, testified that he was retained by Regent, and he opined that the ventilation system was not working properly. Robert Lukas, a geotechnical engineer, testified to his opinion that moisture from the water table rose to the ground level, and that Kildare failed to circulate warm air to the crawl space below Freezer K to prevent that moisture from freezing. Lukas further testified that once the ground below the crawl space froze, ice lenses formed which caused the uplifting of the floor slab. Lukas opined that the heave would have occurred over a longer period of time, and that the witnesses from Kildare were mistaken when they testified that it occurred over a few months.

¶ 17    In Kildare's rebuttal, Richard Finno testified that he is a geotechnical engineer and professor at Northwestern University teaching civil engineering. Finno disagreed with Lukas's contention that the heave occurred over a longer period of time. Finno testified that the root cause of the heaving was "the incident that occurred in September when the door was left open and *** a lot of ice accumulated in the Freezer K." He opined that water was sucked in by the ventilation system and condensed on the frozen concrete as a result of the degraded insulation, before dripping onto the soil.

¶ 18    Finno noted that there had been "50 years of *** good performance of that freezer system," and, "at that point then something in my mind had to happen to change conditions." Finno

concluded that the "source of water c[ould]n't be groundwater," it "ha[d] to be something else." Finno believed that the "water from the September incident impacted the insulation [and] made the insulation not effective." Finno further testified that the floor slab "would only freeze after the insulation became degraded," and at that point, air going over the "frozen concrete surface \*\*\* cause[d] condensation" which "drip[ped]," "penetrate[d] into the soil and bec[a]me the source of water" in the soil. Finno further explained that the insulation had to have been damaged prior to the water dripping into the soil because "if the insulation is working properly, it prevents the bottom of the slab, the bottom of the structural slab right above the crawl space, from freezing. \*\*\* So the difference of competent insulation or compromised insulation allowed the bottom of that slab to freeze."

¶ 19 Accordingly, Finno concluded that the most probable explanation of what happened in Freezer K was that "there were doors open, there was frost caused in the ceiling that compromised in the installation, and when the installation was compromised, it caused water to go into the soil." Finno reiterated that "the installation being compromised [wa]s the root cause."

¶ 20 At the close of all evidence, Regent orally "renew[ed] [its] motion for a directed verdict." Regent argued that a directed verdict was warranted because the experts "agreed that we had freezing below the soil that uplifted the footings. That falls into that Earth Movement exclusion."

¶ 21 Kildare's counsel responded that the earth movement exclusion did not apply, but regardless of its applicability,

"when this insulation got compromised, that was a loss, and [Regent] should have paid [Kildare] on that. \*\*\* Everyone said that that slab was going and needed to be demolished once that insulation was wrecked. Everyone said that. There's no disagreement on that. \*\*\* The jury could award in favor of [Kildare] without even addressing Earth movement."

¶ 22    The trial court reserved ruling on the motion, sending the case to the jury. After deliberations, the jury returned a verdict in favor of Kildare. The jury awarded a total of $544,366, which was comprised of $204,000 for the cost of necessary repairs—a reduction from the $398,740 sought by Kildare—and $340,366 for the loss of business income. The court entered judgment on the jury verdict on June 7, 2018.

¶ 23    Following the jury verdict, Regent filed a motion for JNOV, and both parties filed briefs on Regent's motion for directed verdict. Additionally, Kildare filed a motion for prejudgment interest on July 25, 2018. Kildare asked the circuit court to award prejudgment interest pursuant to section 2 of the Interest Act (815 ILCS 205/2 (West 2018)), which allows such interest to be awarded "for all moneys after they become due on *** [an] instrument of writing."

¶ 24    On August 2, 2018, the trial court entered an order concluding that the earth movement exclusion "broadly limits coverage for rising or shifting soil caused by freezing or expansion" and that its "plain and ordinary language was unambiguous." The court further stated that it was "factually undisputed that Kildare's loss was caused by the freezing and expanding of moisture in the underground soil, which exerted pressure and caused Freezer K's concrete floor to heave." Accordingly, the court concluded that the "loss was expressly excluded by the Earth Movement exclusion," finding that the "evidence so overwhelmingly favors Regent in that the Earth Movement exclusion bars coverage and no contrary verdict based on the evidence could stand." The circuit court granted Regent's motion for a directed verdict or, in the alternative, JNOV, vacated the jury verdict, and "disposed of [the case] in its entirety."

¶ 25    Kildare filed a timely notice of appeal from the August 2, 2018, order, and in this appeal, Kildare contends that the trial court erred in granting Regent's motion for a directed verdict and also in its alternative granting of Regent's motion for JNOV. Although motions for directed

9

verdicts and motions for JNOV are made at different times, they raise the same questions and are governed by the same rules of law. *Maple v. Gustafson*, 151 Ill. 2d 445, 453 n.1 (1992). Accordingly, we will review the court's granting of a directed verdict and its alternative granting of JNOV simultaneously.

¶ 26    Either party may move for directed verdict at the close of evidence. 735 ILCS 5/2-1202(a) (West 2016). A judge may grant the motion, deny the motion, or reserve a ruling on the motion and submit the case to the jury. *Id.* A directed verdict or JNOV should be granted only when " 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [a] movant that no contrary verdict based on that evidence could ever stand.' " *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006) (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)).

> "In other words, a motion for [JNOV] presents 'a question of law as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the [plaintiff's] case.' " *Id.* (quoting *Merlo v. Public Service Co. of Northern Illinois*, 381 Ill. 300, 311 (1942)).

In ruling on such a motion, a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion. *Maple*, 151 Ill. 2d at 453. The standard for entry of JNOV is a high one, and JNOV is not appropriate if " 'reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented.' " *York*, 222 Ill. 2d at 178 (quoting *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 351 (1995)).

¶ 27    A trial court may not set aside a verdict simply because a jury could have drawn different conclusions or inferences from the evidence or because it feels other possible results may have been far more reasonable. *Northern Trust Co. v. University of Chicago Hospitals & Clinics*, 355 Ill. App. 3d 230, 241 (2004); *Pedrick*, 37 Ill. 2d at 504 (the right of the parties to have a substantial factual dispute resolved by the jury should be "carefully preserve[d]" where such a dispute exists). "Likewise, a reviewing court may not usurp the role of the jury and substitute its own judgment on factual questions fairly submitted, tried, and determined from evidence which did not overwhelmingly favor either position." *Northern Trust Co.*, 355 Ill. App. 3d at 241. Our standard of review from the appeal of a directed verdict or JNOV is *de novo*. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37.

¶ 28    The insurance policy at issue in this case is an "all risk" policy.

> "Generally, an all risk insurance policy creates a special type of coverage extending to risks not usually covered under other insurance, and recovery under an all risk policy will, as a rule, be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage." (Internal quotation marks omitted.) *Cincinnati Insurance Co. v. American Hardware Manufacturers Ass'n*, 387 Ill. App. 3d 85, 109 (2008).

¶ 29    To establish a *prima facie* case in a lawsuit involving an insurer's failure to pay a claim under an all-risk insurance policy, the insured has the burden to prove that (1) a loss occurred, (2) the loss resulted from a fortuitous event, and (3) an insurance policy covering the property was in effect at the time of the loss. *Gulino v. Economy Fire & Casualty Co.*, 2012 IL App (1st) 102429, ¶ 16. Once a *prima facie* case is established, the burden shifts to the insurer to affirmatively demonstrate that the loss resulted from a peril expressly excluded from coverage. *Id.*

11

¶ 30    Regent has not contested that a *prima facie* case was established either at trial or in this appeal. Instead, Regent claims that Kildare's loss was excluded under the policy.

¶ 31    The specific basis for the trial court's directed verdict and JNOV was the "Earth Movement Exclusion" contained in the policy. Specifically, Regent contends that Kildare's loss was precluded by that exclusion, which provides, in relevant part, as follows:

> "We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
>
> * * *
>
> b. Earth Movement
>
> * * *
>
> (4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface."

¶ 32    When interpreting an insurance policy or any other contract, the court's primary goal is to give effect to the intent of the parties as expressed in the agreement. *DeSaga v. West Bend Mutual Insurance Co.*, 391 Ill. App. 3d 1062, 1066 (2009). If the terms of an insurance policy are clear and unambiguous, they must be given their plain and ordinary meaning and enforced as written, unless doing so would violate public policy. *Id.* However, "[i]t is the insurer's burden to affirmatively demonstrate the applicability of an exclusion." *Pekin Insurance Co. v. Miller*, 367 Ill. App. 3d 263, 267 (2006). When an insurer relies upon exclusionary policy language to deny

12

coverage, the language's application to the facts must be clear and free from doubt. *Cohen Furniture Co. v. St. Paul Insurance Co. of Illinois*, 214 Ill. App. 3d 408, 412-13 (1991).

¶ 33 Kildare initially contends that the trial court improperly granted Regent's motion for a directed verdict because the earth movement exclusion is ambiguous. Accordingly, Kildare maintains that the exclusion must be read in its favor, as the insured, to exclude only losses from naturally occurring events and not earth movement that stems from human action. Kildare relies on *Mattis v. State Farm Fire & Casualty Co.*, 118 Ill. App. 3d 612, 617 (1983), which held that the earth movement exclusion in that case was ambiguous, limited to losses with causes "of the same class as earthquake and landslide," and not intended to cover a loss caused in part by "defective design and construction."

¶ 34 Regent, by contrast, contends that the court in *Mattis* was interpreting an earth movement exclusion with different language and that more recent cases examining earth movement exclusions identical to the exclusion here have found those exclusions to unambiguously apply to both naturally occurring soil conditions and soil conditions resulting from human action. Regent relies on *Sports Arena Management, Inc. v. Great American Insurance Group*, No. CIV.A. 06 C 0788, 2007 WL 684003, at *3 (N.D. Ill. Mar. 1, 2007) (unreported), which rejected the insured's argument that the earth movement exclusion in the policy was "limited to naturally occurring events" and holding that the exclusion was "unambiguous" and "broadly limit[ed] coverage for rising or shifting soil caused by freezing or expansion." Regent also cites *Temperature Service Co. v. Acuity*, No. 16 C 2271, 2018 WL 1378345, at *6 (N.D. Ill. Mar. 15, 2018) (unreported), concluding that "the earth movement exclusion in plaintiffs' policy unambiguously includes soil conditions resulting from human action." But see *County of Du Page v. Lake Street Spa, Inc.*, 395

13

Ill. App. 3d 110, 122 (2009) ("Holdings of federal district courts are not precedential or binding on this court," "especially *** where the decision is unreported.").

¶ 35    Despite this alleged conflict, we need not determine whether the earth movement exclusion in this case is ambiguous, because we find Kildare's second argument dispositive. Kildare asserts that even if the earth movement exclusion excludes losses related to the heaving floor, the evidence at trial showed two separate losses—the first loss occurred when the insulation became damaged and required replacement, and the second loss occurred later, when the floor heaved. Because there was testimony that the floor slab was required to be demolished and replaced as a result of the first loss—prior to the later floor heaving—Kildare contends that the vast majority of the repair expenses, aside from those associated with the heaters that were rented to bring the floor back down to level, were recoverable as part of the first loss. Kildare asserts that the jury apparently credited the testimony regarding separate losses, awarding it losses related to the damaged insulation and "reduc[ing] the ultimate verdict down from the full amount requested indicating that they had excluded damages for any heaving."

¶ 36    Regent responds that Kildare's argument is a "futile attempt to rewrite the facts of the case" and that Kildare is "concocting a new 'theory' after 10 years of litigation." Regent points to evidence of the proof of loss statement regarding damage to the "Freezer Floor" and testimony from witnesses that repairs were made because of the upheaval of the concrete floor.

¶ 37    To the extent that Regent is contending that Kildare is raising a new theory on appeal, we reject that notion. Kildare clearly raised the issue at trial that the damage to the insulation was a separate and covered loss, and there was evidence presented to support that theory. Specifically, there was testimony that the process of deicing the ceiling coils in September 2008 caused melting ice and dripping water, which penetrated cracks in the floor and saturated the insulation

underneath, rendering the insulation damaged and in need of replacement. There was also testimony that, even if the floor had not heaved, it was necessary for the saturated insulation to be replaced, and that the insulation could not be replaced without demolishing the floor. Kildare presented evidence that the repairs required as a result of the first loss amounted to $384,340, which was the total amount of repairs—$398,740—less the amount spent on floor heaters to remedy the floor heaving—$14,400.

¶ 38    Kildare argued during closing that:

> "Arguably, there are two losses. You heard that in September there was damage to the insulation that compromised that insulation. It wasn't seen at the time because it was covered by the floor slab. *** The second loss is the uplift of the floor several months later. When that water through condensation from the outside came and accumulated under the structural slab and rained down on the soil, got in there, and then the columns acted as a conduit and froze it, and then ice pushed up ***. And that was the heave. You should analyze these separately. Suppose, for example, the heave did not happen; would we still have a covered loss? Yes. The integral part of the building was damaged."

¶ 39    Although we agree with Regent's contention that the experts consistently testified that the source of the floor's *heaving* was due to freezing and expanding of moisture in the soil, the fact remains that there is some evidence that was presented regarding the existence of a separate and prior loss. We reiterate that, in reviewing the granting of a directed verdict or JNOV, this court will not reweigh the evidence or the credibility of the witnesses; we may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion. *Maple*, 151 Ill. 2d at 453. Considering the evidence and inferences in the light most

favorable to Kildare, as we must, we conclude that was evidence to support the jury's conclusion that there existed at least $204,000 in damage to the insulation that was not barred by the earth movement exclusion.

¶ 40    Regent, however, contends that "any theory proffered by Kildare would not make a difference" because the insurance policy contains an "anti-concurrent causation" clause, which provides that losses or damage from an excluded cause are "excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss."

¶ 41    In *Bozek v. Erie Insurance Group*, 2015 IL App (2d) 150155, the Second District Appellate Court considered a similar anti-concurrent causation clause. In that case, homeowners made a claim on their homeowner's insurance policy after their inground swimming pool heaved out of the ground. The evidence showed that two events—one covered under the policy (a failed pressure-relief valve), and one excluded under the policy (hydrostatic pressure), contributed to a single loss, specifically, the lifting of the pool out of the ground. The homeowners claimed, among other things, that the anti-concurrent causation clause did not apply because the covered cause, the failure of the pressure-relief valve, happened prior to the excluded cause, the hydrostatic pressure.

¶ 42    The court explained that the anti-concurrent causation clause barred coverage where two events, one covered and one excluded, contributed to the same loss, at either the same time or one after the other. The court noted that in determining whether the anti-concurrent causation clause applied, it did "not look at the point in time that the valve failed; we look at the point in time that the failed valve contributed to the loss." The court concluded that the failed pressure-relief valve did not cause any loss until it converged with the excluded event and the two causes contributed concurrently to the loss.

¶ 43    In so holding, the court distinguished two cases relied on by the homeowners, *Corban v. United Services Automobile Ass'n*, 2008-IA-00645-SCT (Miss. 2009), and *Robichaux v. Nationwide Mutual Fire Insurance Co.*, 2010-CA-00109-SCT (Miss. 2011), both relating to home damage sustained during Hurricane Katrina.

¶ 44    In *Corban*, the insureds' policy covered losses due to wind but excluded losses due to flood. The insurance company concluded that "the majority" of the damage to the property was due to flood and denied coverage based on the policy's anti-concurrent causation clause. *Corban*, 2008-IA-00645-SCT, ¶ 2 (Miss. 2009).

¶ 45    As the Second District Appellate Court explained, the *Corban* court

> "determined that the 'loss' 'occurs at that point in time when the insured suffers deprivation of, physical damage to, or destruction of the property insured.' [Citation.] It explained that an insured's right to be indemnified for a covered loss vests *at the time of the loss.* [Citation.] Once a duty to indemnify arises, it cannot be extinguished by a successive cause or event. [Citation.] When different forces have caused *different damage*, the term 'loss' should not refer to the total loss. [Citation.] Rather, the particular losses caused by a covered event are covered and the particular losses caused by an excluded event are not covered. [Citation.]
>
> * * *
>
> Applying these principles, the [*Corban*] court determined that the anticoncurrent-causation clause did *not* apply to at least a portion of the damage. [Citation.] The evidence that had thus far been presented showed that the *same loss* with multiple causes was not at issue. Rather, the subject perils acted at different times, causing different damage, resulting in *separate losses.* [Citation.] ***

17

'*** If the property first suffers damage from wind, resulting in a loss, whether additional "[flood] damage" occurs is of no consequence, as the insured has suffered a compensable wind-damage loss.' [Citation.]" (Emphases in original.) *Bozek*, 2015 IL App (2d) 150155, ¶¶ 29-32 (citing *Corban*, 2008-IA-00645-SCT ¶¶ 31, 32, 33, 38, 43, 44 (Miss. 2009)).

¶ 46    Similarly, in *Robichaux*, the insureds' policy covered loss caused by a windstorm but excluded loss caused by flooding. The Second District Appellate Court noted that the evidence in *Robichaux*

"showed that not all of the damage was caused by the simultaneous convergence of wind and water. [Citation.] For example, the engineering expert had opined that the property sustained wind damage, such as the loss of roof shingles, *before* the property was pushed down by the storm's water surge. [Citation.] As such, the anticoncurrent-causation clause did not apply to that damage. [Citation.] The insureds were entitled to compensation for the wind damage that occurred prior to the storm surge; coverage for that particular loss had vested. [Citation.] However, the anticoncurrent-causation clause precluded coverage for subsequent damage caused by the storm surge, even though that surge was driven by the wind. [Citation.] In that instance, the wind and the water would have converged to cause a single loss. [Citation.]" (Emphasis in original.) *Id.* ¶ 33 (citing *Robichaux*, 2010-CA-00109-SCT ¶ 18 (Miss. 2011)).

¶ 47    In *Bozek*, however, the Second District Appellate Court concluded that coverage for damage to the homeowners' swimming pool was precluded under the anti-concurrent causation clause.

> "Unlike in *Corban* and *Robichaux*, the covered event [in *Bozek*] did not lead to a separate, or different, loss. *** The failed pressure valve did not cause any loss *until* it converged with the excluded event. Put another way, prior to the excluded event, there was no loss for which coverage could conceivably vest. *** Thus, the anticoncurrent-causation clause plainly precludes coverage." (Emphasis in original.) *Id.* ¶ 34.

¶ 48    Taking the evidence and inferences in the light most favorable to Kildare, the evidence here is more like that presented in *Corban* and *Robichaux*, than *Bozek*. Because there was some evidence presented to support Kildare's theory that the insulation was damaged prior to any damage that occurred from earth movement, Kildare is entitled to compensation for the covered loss that occurred and was vested prior to any later excluded loss. See *id.* ¶ 33. Stated differently, whether additional earth movement damage occurred would be "of no consequence," where Kildare had suffered a prior compensable loss. See *id.* ¶ 32.

¶ 49    Because we have found that the earth movement exclusion was not a proper basis for entering a directed verdict or JNOV, we will next consider Regent's alternative bases for affirming the circuit court's order. See *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 454 (2007) ("[W]e are not bound by the reasoning given by the trial court, and we may affirm on any grounds that are justified by the record."). Specifically, Regent contends that the "Faulty Maintenance Exclusion" also justifies the denial of coverage. That exclusion provides that Regent will not cover loss or damage "caused by or resulting from *** [f]aulty,

inadequate or defective *** Maintenance *** of any part or all of any property on or off the described premises." Regent claims that there was "overwhelming evidence that Kildare's claimed loss was caused by Kildare's faulty maintenance," specifically by "failing to provide heat to the crawl space under Freezer K as required." Regent's argument on this point is essentially that the fact that there was ice in the crawl space necessarily means that Kildare failed to adequately heat it.

¶ 50    Although Regent presented the theory at trial that Kildare had failed to provide heat to the crawl space, there was conflicting evidence on this point. Specifically, Sanders testified that the "freezing and heaving did not occur due to a failure or improper operation of the ventilation system that was underneath the floor and kept the floor from freezing." Sanders testified that he did not notice any maintenance issues and that the equipment was "operational" and "in good working order." Sanders specifically opined that a failure in the ventilation system would not explain the ice under the crawl space because Freezer K shared the same ventilation system with another freezer room, and there was no reported freezing or heaving in that freezer. The jury apparently weighed the conflicting evidence and rejected Regent's faulty maintenance theory. *Northern Trust Co.*, 355 Ill. App. 3d at 241 ("[T]he trial court may not reweigh the evidence and set aside the verdict simply because a jury could have drawn different conclusions or inferences from the evidence or because it feels other possible results may have been far more reasonable."). Accordingly, we conclude that the circuit court erred in entering a directed verdict or, in the alternative, JNOV.

¶ 51    Finally, Kildare asks this court to "grant" its motion for prejudgment interest, which the parties agree was denied by the circuit court in light of its decision to grant a directed verdict in favor of Regent. An award of prejudgment interest is appropriate where it is "authorized by statute,

agreement of the parties[,] or warranted by equitable considerations." *Tully v. McLean*, 409 Ill. App. 3d 659, 684-85 (2011). "Illinois law permits the award of prejudgment interest" where warranted, and the decision "to award prejudgment interest is within the circuit court's sound discretion, subject to reversal only upon abuse of discretion." *United States Fidelity & Guaranty Co. v. Alliance Syndicate, Inc.*, 286 Ill. App. 3d 417, 419-20 (1997) (citing *In re Estate of Wernick*, 127 Ill. 2d 61, 87 (1989)). Because we conclude that the circuit court erred in granting a directed verdict, we instruct the circuit court to consider the motion for prejudgment interest on remand. We express no opinion on whether prejudgment interest would be warranted in this case.

¶ 52    For the foregoing reasons, the trial court should have denied Regent's motions for a directed verdict and for JNOV. Accordingly, the judgment of the circuit court of Cook County is reversed, and the cause remanded with directions to reinstate the verdict for $544,366 in favor of Kildare, and to consider Kildare's motion for prejudgment interest.

¶ 53    Reversed and remanded with directions.

---

**No. 1-18-1840**

---

| | |
|---|---|
| **Cite as:** | *4220 Kildare, LLC v. Regent Insurance Co.*, 2020 IL App (1st) 181840 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 10-L-010065 and 16-L-010618; the Hon. Thomas Mulroy, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Ronald A. Stearney Jr., of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Robert Ostojic and Shaleigh R. Jansen, of Leahy, Eisenberg & Fraenkel, Ltd., of Chicago, for appellee. |

---